In re NATURALIZATION OF JOHN MINOOK.

(Third Division. Fairbanks. May 16, 1904.)

1. CITIZENS—FOREIGN SUBJECTS IN LANDS CEDED—NATURALIZATION.

By the third article of the treaty of 1867 with Russia, by which she ceded Alaska to the United States, it was provided that the Russian inhabitants there might return to their native land within three years, "but if they should prefer to remain in the ceded territory, they, with the exception of uncivilized native tribes, shall be admitted to the enjoyment of all the rights, advantages, and immunities of citizens of the United States." *Held*, that such Russian subjects as remained in Alaska after three years became naturalized citizens of the United States by virtue of the treaty and the subsequent laws passed by Congress incorp. rating Alaska into the United States.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Citizens, § 4.]

2. INDIANS — NATURALIZATION — CITIZENSHIP —TRIBAL RELATION — SEVERANCE.

By the third article of the treaty of cession with Russia, the United States agreed that "the uncivilized tribes [of Alaska] will be subject to such laws and regulations as the United States may from time to time adopt in regard to aboriginal tribes of that

country." *Held* that, upon this treaty provision and the subsequent laws passed by Congress incorporating Alaska into the United States, those general laws passed by Congress in relation to the Indian tribes of the United States extended to Alaska, and the uncivilized tribes there are entitled to the same rights, privileges, and immunities under such laws as are the aboriginal tribes within the United States. *Held* further, that under the act of Congress known as the "Indian Severalty Bill" (Act Feb. 8, 1887, 24 Stat. 388, c. 119), those Indians or half-breeds in Alaska who have voluntarily taken up their residence separate and apart from any tribe of Indians, and have adopted the habits of civilized life, became thereby citizens of the United States by naturalization.

[Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Indians, § 23.]

John Minook, whose true name is Ivan Pavlof, is the son of a Russian trader at St. Michael and an Eskimo mother. Both parents were members of the Russian Church, were married in and according to the rites and observances of the church, and their son, the applicant herein, was born in 1849 at St. Michael in the Russian possessions in North America. Both parents resided in Alaska at the time of the cession to the United States on March 30, 1867, and continued to reside there until their death. The applicant was married subsequent to 1867 to a native woman. They have reared a family of children, whom they have attempted to educate and teach the principles of the Christian religion. The largest mining stream in the Rampart mining district was named "Minook Creek" in recognition of his worth as a man and miner. He has adopted the habits of civilized life in dress, manners, and habitation, has considerable knowledge of, and renders obedience to, the laws of the United States, and speaks the English language. His witnesses and neighbors testify that he is a fit and proper person to be made an American citizen.

On the 25th day of August, 1900, before the clerk of this court, under the name of Ivan Minook, the applicant declared his intention to become a citizen of the United States, and

on the 30th day of July, 1903, he appeared in open court at Rampart, Alaska, with his witnesses, and made proof of the general facts herein stated, as well as other facts required by the naturalization laws, and requested the court to make an order admitting him to citizenship.

Abe Spring, amicus curiæ, filed a brief in support of the application.

WICKERSHAM, District Judge.　Petitioner seeks naturalization upon the theory that he is now a subject of Russia, but it is suggested on his behalf, also, that he became a citizen of the United States by virtue of the naturalization clause in the third article of the treaty of 1867 between Russia and the United States, by which the former ceded Alaska to the latter.　That article is as follows:

"The inhabitants of the ceded territory, according to their choice, reserving their natural allegiance, may return to Russia within three years; but if they should prefer to remain in the ceded territory, they, with the exception of uncivilized native tribes, shall be admitted to the enjoyment of all the rights, advantages, and immunities of citizens of the United States, and shall be maintained and protected in the free enjoyment of their liberty, property, and religion. The uncivilized tribes will be subject to such laws and regulations as the United States may from time to time adopt in regard to aboriginal tribes of that country."　Act March 30, 1867, 15 Stat. 542, art. 3.

This treaty stipulation divided the inhabitants of the ceded territory into three classes, each with a different right:　First, those Russian subjects who preferred to reserve their natural allegiance might do so, and "return to Russia within three years"; second, those Russian subjects who preferred to remain in the ceded territory "shall be admitted to the enjoyment of all the rights, advantages, and immunities of citizens of the United States, and shall be maintained and protected in the free enjoyment of their liberty, property, and religion"; and, third, the uncivilized tribes, who should "be subject to

such laws and regulations as the United States may from time to time adopt in regard to aboriginal tribes of that country." Neither the applicant nor either of his parents chose to reserve their natural allegiance and return to Russia within three years, but continued to reside in Alaska, without declaring any intention to retain their Russian citizenship. Now, however, the applicant has made a declaration of his intention to become a citizen of the United States, alleging therein that he is yet a Russian subject. He also offers testimony to show that he was not a member of any of the uncivilized tribes in Alaska at the time of the cession or since.

It would be an idle ceremony, and without the jurisdiction of this court, to go through the forms of naturalization with a citizen of the United States; and if the applicant became a citizen by virtue of his acceptance of the naturalization clause of the treaty of cession, his petition should now be denied, notwithstanding his assertion that he is a Russian subject. It becomes necessary, then, to determine his status under the third article of the treaty.

The Constitution of the United States provides that "the Congress shall have power  *  *  *  to establish a uniform rule of naturalization." Section 8, art. 1. Naturalization is the act of adopting a foreigner, and clothing him with the privileges of a citizen. Boyd v. Nebraska, 143 U. S. 135, 12 Sup. Ct. 375, 36 L. Ed. 103. The general rule established by Congress is that provided by statute, requiring the applicant to make a sworn declaration of his intention to become a citizen before a court of record or the clerk thereof, and thereafter to make proof before the court of his residence and qualifications, and to secure the judgment of the court evidencing his strict compliance with the requirements of the naturalization laws. Sections 2165–2174, Rev. St. 1878 [U. S. Comp. St. 1901, pp. 1329–1334]. Congress may admit a single person by a special act (Act May 18, 1898, 30 Stat.

1496), or by statute admit a specified group, class, or tribe upon conditions (Act. Feb. 8, 1887, 24 Stat. 388, c. 119). The power to naturalize is vested exclusively in Congress, which may prescribe the terms on which the United States will adopt an alien people, or may exclude classes or races whose presence would be a menace to the happiness and welfare of her people.

Upon the cession of Louisiana, the Floridas, the Mexican territories, and Alaska, a similar treaty stipulation extended naturalization to their inhabitants. The Constitution of the United States, however, in prescribing the powers of the President, provides that "he shall have power, by and with the advice and consent of the Senate, to make treaties, provided two-thirds of the Senators present concur" (section 3, art. 2) ; but it is not held that the treaty-making body has the power to naturalize by stipulation, nor to incorporate an alien people into the citizenry of the United States without the consent of Congress. In the recent Insular Cases the Supreme Court of the United States in the main opinion says:

"We are also of the opinion that the power to acquire territory by treaty implies not only the power to govern such territory, but to prescribe upon what terms the United States will receive its inhabitants, and what their status shall be in what Chief Justice Marshall termed the 'American Empire.' There seems to be no middle ground between this position and the doctrine that if their inhabitants do not become, immediately upon annexation, citizens of the United States, their children thereafter born, whether savages or civilized, are such, and entitled to all the rights, privileges, and immunities of citizens. If such be their status, the consequences will be extremely serious. Indeed, it is doubtful if Congress would ever assent to the annexation of territory upon the condition that its inhabitants, however foreign they may be to our habits, traditions, and modes of life, shall become at once citizens of the United States. In all its treaties hitherto the treaty-making power has made special provision for this subject—in the case of Louisiana and Florida, by stipulating that 'the inhabitants shall be incorporated into the Union of the United States, and admitted as soon as possible * * * to the enjoyment of all the rights, advantages, and immunities of citizens of the United States'; in the case of Mexico, that they

should 'be incorporated into the Union, and be admitted at the proper time (to be judged of by the Congress of the United States) to the enjoyment of all the rights of citizens of the United States'; in the case of Alaska, that the inhabitants who remained three years, 'with the exception of uncivilized native tribes, shall be admitted to the enjoyment of all the rights,' etc.; and in the case of Porto Rico and the Philippines, 'that the civil rights and political status of the native inhabitants * * * shall be determined by Congress.' In all these cases there is an implied denial of the right of the inhabitants to American citizenship until Congress by further action shall signify its assent thereto." Downes v. Bidwell, 182 U. S. 244, 21 Sup. Ct. 770, 45 L. Ed. 1088.

Justices White, Shiras, and McKenna, in their concurring opinion in the case of Downes v. Bidwell, also declare:

"Indeed, in view of the rule of construction which I have just considered—that all powers conferred by the Constitution must be interpreted with reference to the nature of the government, and be construed in harmony with related provisions of the Constitution—it seems to me impossible to conceive that the treaty-making power by a mere cession can incorporate an alien people into the United States without the express or implied approval of Congress. * * *

"Thus, if it be true that the treaty-making power has the authority which is asserted, what becomes of that branch of Congress which is peculiarly the representative of the people of the United States, and what is left of the functions of that body under the Constitution? For, although the House of Representatives might be unwilling to agree to the incorporation of alien races, it would be impotent to prevent its accomplishment, and the express provisions conferring upon Congress the power to regulate commerce, the right to raise revenue, bills for which, by the Constitution, must originate in the House of Representatives, and the authority to prescribe uniform naturalization laws, would be, in effect, set at naught by the treaty-making power, and the consequent result—incorporation—would be beyond all future control of or remedy by the American people, since at once, and without hope of redress or power of change, incorporation by the treaty would have been brought about. The inconsistency of the position is at once manifest. * * *

"The theory as to the treaty-making power, upon which the argument which has just been commented upon rests, it is now proposed to be shown, is refuted by the history of the government from the beginning. There has not been a single cession made from the time of the Confederation up to the present day, excluding the recent treaty with Spain, which has not contained stipulations to the effect that

the United States through Congress would either not disincorporate
or would incorporate the ceded territory with the United States.
* * * Such agreements were also expressed in the treaty of 1803,
ceding Louisiana (8 Stat. 202); that of 1819, ceding the Floridas (8
Stat. 252); that in the treaties of 1848 (9 Stat. 922), and 1853 (10
Stat. 1031), by which a large extent of territory was ceded to this
country; as also in the Alaska treaty of 1867 (15 Stat. 539). To
adopt the limitations on the treaty-making power now insisted upon
would presuppose that every one of these conditions thus sedulously
provided for were superfluous, since the guaranties which they afford-
ed would have obtained although they were not expressly provided
for. When the various treaties by which foreign territory has been
acquired are considered in the light of the circumstances which sur-
round them, it becomes to my mind clearly established that the
treaty-making power was always deemed to be devoid of authority
to incorporate territory into the United States without the assent,
express or implied, of Congress, and that no question to the con-
trary has ever been even mooted. * * *

"Pausing to analyze the practical construction which resulted from
the acquisition of the vast domain covered by the Louisiana Pur-
chase, it indubitably results: First, that it was conceded by every
shade of opinion that the government of the United States had the
undoubted right to acquire, hold, and govern the territory as a pos-
session, and that incorporation into the United States could under no
circumstances arise solely from a treaty of cession, even although it
contained provisions for the accomplishment of such result; second,
it was strenuously denied by many eminent men that in acquiring
territory citizenship could be conferred upon the inhabitants within
the acquired territory—in other words, that the territory could be in-
corporated into the United States without an amendment to the Con-
stitution; and, third, that the opinion which prevailed was that, al-
though the treaty might stipulate for incorporation and citizenship
under the Constitution, such agreements by the treaty-making power
were but promises depending for their fulfillment on the future ac-
tion of Congress. In accordance with this view, the territory ac-
quired by the Louisiana Purchase was governed as a mere depend-
ency until, conformably to the suggestion of Mr. Jefferson, it was by
the action of Congress incorporated as a territory into the United
States, and the same rights were conferred in the same mode by
which other territories had previously been incorporated; that is, by
bestowing the privileges of citizenship and the rights and immunities
which pertained to the Northwest Territory. * * *

"It is then, as I think, indubitably settled by the principles of the
law of nations, by the nature of the government created under the
Constitution, by the express and implied powers conferred upon the

government by the Constitution, by the mode in which those powers have been executed, and by an unbroken line of decisions of this court, first announced by Marshall, and followed and lucidly expounded by Taney, that the treaty-making power cannot incorporate territory into the United States without the express or implied assent of Congress, that it may insert in a treaty conditions against immediate incorporation, and that, on the other hand, when it has expressed in the treaty the conditions favorable to incorporation, they will, if the treaty be not repudiated by Congress, have the force of the law of the land, and therefore by the fulfillment of such conditions cause incorporation to result." Concurring opinion of Justices White, Shiras, and McKenna in Downes v. Bidwell, 182 U. S. 300, 21 Sup. Ct. 770, 45 L. Ed. 1088.

By the sixth article of the treaty with Russia the United States agreed, in consideration of the cession of Alaska, to pay that power $7,200,000. When the bill making the appropriation to pay this sum came before Congress, the constitutional right of the treaty-making power to incorporate arose (1, 2, 3, 4, and 5 Globe, 2d Sess. 40th Cong.), and was disposed of by the House of Representatives accepting from a conference committee a preamble reciting that the stipulations of the treaty "that the United States shall accept of such cession * * * cannot be carried into full force and effect except by legislation, to which the consent of both Houses of Congress is necessary." Act. July 27, 1868, 15 Stat. 198, c. 247. The report embracing this preamble was adopted by the Senate and House of Representatives, and practical effect was thus given to the contention that Alaska could not be incorporated by the treaty-making power without the assent of Congress.

It frequently happens that a treaty stipulates for that which can only be accomplished by congressional enactment, in which case Congress, i. e. the Senate and House of Representatives, must exercise the powers of legislation in regard thereto before such stipulation is effective. The ratification of a treaty by the Senate creates a contract, but does not execute it. When a treaty requires legislative enactments before it can

become operative, it will take effect as a national compact on being proclaimed, but it cannot become operative as to the particular engagements until the requisite legislation has taken place. Foster v. Neilson, 2 Pet. 253, 314, 315, 7 L. Ed. 415; United States v. Arredondo, 6 Pet. 691, 734, 735, 8 L. Ed. 547. The treaty with Russia for the cession of Alaska created a contract on the part of the United States to accept the grant, to pay the consideration, and to incorporate the inhabitants thereof, excepting the uncivilized tribes, into the body of the citizens of the United States upon the terms specified; but it was not self-executing, and depended for its complete ratification and final execution upon the assent of Congress. The treaty could neither appropriate the money necessary to pay Russia, nor naturalize the inhabitants of the ceded territory; only Congress had that power, and it might refuse to do either or both. Congress did not, however, refuse. The necessary appropriation was made by Congress, and the consideration for the transfer was by congressional appropriation paid to Russia. Congress did not specifically assent to the treaty stipulation promising citizenship to the inhabitants of Alaska. No act of Congress has been called to the attention of the court which expressly approves or assents to the naturalization of those inhabitants of Alaska mentioned in the third article of the treaty. In the case of the Louisiana territory, the citizenship of the inhabitants mentioned in the treaty was, in effect, recognized by the ninth section of the act creating the Missouri territory in 1812, while the fourteenth section contained an elaborate declaration of the rights secured to the people of the territory. · 2 Stat. 743, c. 95. In 1822 a similar act was passed for Florida. 3 Stat. 654, c. 13. Both of these territories were partly organized, however, by the earlier acts providing for temporary governments therein, and extending certain laws of the United States to them, and their inhabitants were promptly recognized as citizens by the

courts. Not so, however, with the Mexican territories, and particularly California. Benton tells us, in his "Thirty Years in the United States Senate," that:

"The treaty of peace with Mexico had been ratified in the session of 1847–48, and all the ceded territory became subject to our government, and needing the immediate establishment of territorial governments; but such were the distractions of the slavery question that no such governments could be formed nor any law of the United States extended to these newly acquired and orphan dominions. Congress sat for six months after the treaty had been ratified, making vain efforts to provide government for the new territories, and adjourned without accomplishing the work."

Before that Congress adjourned, however, it passed an act to establish certain post routes in California (Act. Aug. 14, 1848, 9 Stat. 320, c. 175), and in a civil and diplomatic appropriation bill appropriated money to pay the expenses of marking the boundary between Mexico and the United States (Act Aug. 12, 1848, 9 Stat. 301, c. 166).

President Polk and his Cabinet took the position that by such legislation Congress had, by implication, ratified and approved the provisions of the treaty, which needed the assent of Congress to become operative under the Constitution. Acting upon that assumption, the Secretary of the Treasury issued instructions to enforce there the tariff and navigation laws of the United States, and such action was sustained by the Supreme Court in Cross v. Harrison, 16 How 164, 14 L. Ed. 889. In the concurring opinion of Justices White, Shiras, and McKenna, in speaking of this implied approval of the Mexican treaty by Congress, they say:

"The treaty, besides, contained a stipulation for rights of citizenship; in other words, a provision equivalent in terms to those used in the previous treaties to which I have referred. The controversy which was then flagrant on the subject of slavery prevented the passage of a bill giving California a territorial form of government, and California, after considerable delay, was therefore admitted directly into the Union as a state. After the ratification of the treaty, various laws were enacted by Congress, which, in effect, treated the territory

2 A.R.—14

as acquired by the United States; and the executive officers of the government, conceiving that these acts were an implied or express ratification of the provisions of the treaty by Congress, acted upon the assumption that the provisions of the treaty were thus made operative, and hence incorporation had thus become efficacious. Ascertaining the general rule from the provisions of this latter treaty and the practical execution which it received, it will be seen that the precedents established in the cases of Louisiana and Florida were departed from to a certain extent; that is, the rule was considered to be that where the treaty, in express terms, brought the territory within the boundaries of the United States, and provided for incorporation, and the treaty was expressly or impliedly recognized by Congress, the provisions of the treaty ought to be given immediate effect. But this did not conflict with the general principles of the law of nations which I have at the outset stated, but enforced it, since the action taken assumed, not that incorporation was brought about by the treaty-making power wholly without the consent of Congress, but only that, as the treaty provided for incorporation in express terms, and Congress had acted without repudiating it, its provisions should be at once enforced.

"Without referring in detail to the acquisition from Russia of Alaska, it suffices to say that that treaty also contained provisions for incorporation, and was acted upon exactly in accord with the practical construction applied in the case of the acquisition from Mexico, as just stated. However, the treaty ceding Alaska (15 Stat. 539) contained an express provision excluding from citizenship the uncivilized native tribes, and it has been nowhere contended that this condition of exclusion was inoperative because of the want of power under the Constitution in the treaty-making authority to so provide, which must be the case if the limitation on the treaty-making power, which is here asserted, be well founded. The treaty concerning Alaska, therefore, adds cogency to the conception established by every act of the government from the foundation—that the condition of a treaty, when expressly or impliedly ratified by Congress, becomes the measure by which the rights arising from the treaty are to be adjusted."

It follows from these authorities that the contract made by the treaty-making power of the United States with Russia, as a part consideration for the cession of Alaska, that the civilized inhabitants remaining there after three years should be admitted to full citizenship, could be ratified or executed by the implied action or approval of Congress. Congress

did not repudiate the treaty, but, on the contrary, in 1868 extended to Alaska the "laws of the United States relating to customs, commerce, and navigation;" created a collection district therein, and established a port of entry at Sitka; gave the United States courts of California, Oregon, and Washington jurisdiction of offenses committed there; provided for protection of the seal fisheries; and otherwise provided for the civil government of the country. 15 Stat. 240, c. 272. Other acts were passed in aid of those mentioned, and in 1884 "An act providing a civil government" was passed, and territorial officers appointed. 23 Stat. 24, c. 53. The concurring justices in Downes v. Bidwell held that these acts of Congress, establishing civil government in Alaska, are sufficient to constitute an implied approval and ratification of the treaty:

"Without referring in detail to the acquisition from Russia of Alaska, it suffices to say that that treaty also contained provisions for incorporation, and was acted upon exactly in accord with the practical construction applied in the case of the acquisitions from Mexico, as just stated."

The following conclusions seem to contain the substance of the authorities upon the question at issue: (1) The treaty-making power may contract to naturalize the inhabitants of foreign territory ceded to the United States by treaty. (2) It may agree upon terms upon which such alien inhabitants may be adopted into the citizenry of our nation. (3) The treaty-making authority does not possess power to naturalize aliens by treaty stipulation. (4) Congress alone has power to admit aliens to citizenship, and may do so upon such terms as it prescribes. (5) Congress may admit, or refuse to admit, aliens to citizenship upon the terms stipulated in the treaty. (6) The treaty stipulation promising naturalization may be ratified by Congress, and naturalization follow in accordance therewith, either by its express or implied approval, or its failure to repudiate. (7) Congress did impliedly approve the

third article of the treaty with Russia for the cession of Alaska by the passage of the acts of Congress to pay the consideration, to extend the customs, commerce, and navigation laws, and a long line of laws extending civil government, and establishing a territorial government therein. (8) Alaska thereby became, and is now, one of the organized territories of the United States. The Coquitlam, 163 U. S. 346, 16 Sup. Ct. 1117, 41 L. Ed. 184; Binns v. U. S., 194 U. S. 486, 24 Sup. Ct. 816, 48 L. Ed. 1087. (9) Those civilized inhabitants resident in the Russian possessions when ceded to the United States, who did not choose to reserve their natural allegiance, and return to Russia within three years after the ratification of the treaty, but who preferred to and did remain in the ceded territory, after three years became thereby, ipso facto, "admitted to the enjoyment of all the rights, privileges, and immunities of citizens of the United States."

Was the applicant an "inhabitant" who became a citizen of the United States under the treaty, or a member of the excluded "uncivilized native tribes" of Alaska? The United States and Russia are civilized nations, and every person being a citizen of either, although individually lacking in education or other civilized standards, is a civilized person. We do not recognize a legal difference between members of the same nation based on standards of culture. While one may stand at the bottom and another at the top, if they belong to the same race or nation they are classed together. The rule works both ways. Even if a member of an uncivilized native tribe were to become educated, and adopt the habits of civilized life, he could not thereby expatriate himself, and become a citizen of the nation higher in culture without its consent. Elk v. Wilkins, 112 U. S. 94, 5 Sup. Ct. 41, 28 L. Ed. 643. It becomes necessary, then, to determine the status of the applicant as a member of the Russian nation at the time of the cession of Alaska to the United States.

In 1841 the Emperor of Russia granted to the existing Russian-American Company privileges extending over a further period of 20 years, with provisions for the establishment of a new charter for the government of the colonies. In October, 1844, an imperial ukase was signed, promulgating this charter, which, among other provisions, fixed and defined the status of the people of Alaska, both Russian and native, in respect to the Russian nation. Chapter 8 deals with the rights of persons living in places reserved for the company, and fixes the status of the inhabitants in great detail. In so far as it is important to explain the status of the colonists, it is as follows:

"ARTICLE 2.

"Of Colonial Civilians.

"Sec. 227. Russian subjects and persons of free station, having the right to leave America, who have voluntarily settled in that country, shall form a distinct class of society,—that of colonial civilians,—under the conditions hereinafter provided.

"Sec. 228. Russian commoners and peasants, temporarily resident in the American colonies, voluntarily in the service of the company, married to creole or native American women, and who on account of sickness, old age, or long residence, and by having become acclimatized and accustomed to the mode of life of the country, or who, during long absence from Russia, have lost their near relatives, upon expressing to the company their desire to settle permanently in the country and handing in a written request for permission so to do, shall be assigned to settle on the Kenai shore of America, or in such other localities as the Governor may consider most opportune,—provided that they be within the Russian possessions,—and it shall be the duty of the company to erect for such colonists suitable dwellings; to furnish them with implements necessary for hunting and agriculture, together with domestic animals, cattle, fowls, and grain for sowing; to provide them with food supplies for one year; and to guard against the possibility of their suffering future privations.

"Sec. 229. Such persons shall be excluded from the class to which they belonged in Russia, after the company shall have communicated with the authorities charged with such matters.

"Sec. 230. They shall be permitted to pursue their previous callings, and the said authorities shall demand from the company, on their account, a poll-tax only, waiving all other assessments to which they

were previously liable; such poll-tax to be levied in accordance with the list of these persons furnished by the administration of the company.

"Sec. 231. The names of commoners and peasants so assigned to settlements shall be forwarded annually, through the chief administrative office, with its other reports, to the Minister of Finance.

"Sec. 232. The children of such settlers shall be regarded as creoles, and may enter the company's employ, if they so desire, at the established rates of remuneration.

"Sec. 233. They shall be permitted to dispose of such superfluous commodities as they may accumulate, at prices arranged by agreement with the purchaser; except in the case of furs and animal goods, which shall be sold only at the established rates.

"Sec. 234. There shall be no restrictions against the colonial civilians taking service with the company under contract, if the consent of the colonial administration be obtained thereto.

"Sec. 235. In the allotment of ground to colonial civilians, the company shall particularly bear in mind that the natives are not to be embarrassed, and that the colonial civilians are to support themselves by their own labor.

## "ARTICLE 3.

### "Of the Creoles.

"Sec. 236. Children born of a European or Siberian father and a native American mother, or of a native American father and a European or Siberian mother, shall be regarded as creoles, equally with the children of these latter, of whom a special record is preserved.

"Sec. 237. The creoles are Russian subjects, and, as such, shall have a right to the lawful protection of the Government, equally with all other subjects belonging to the rank of commoners; even should they not, by merit and for special cause, acquire the rights extended to people belonging to a different station.

"Sec. 238. Pending further legislative action, creoles remaining in the colonies shall not be subject to any governmental tax or dues.

"Sec. 239. The colonial authorities shall exercise special guardianship over the creoles and their property.

"Sec. 240. Creoles who have entered the service of the company and have shown faithfulness and capability in the discharge of their duties, may, in the discretion of the company, be admitted to the enjoyment of the privileges accorded to other Russian subjects who have entered the service from the rank of commoners.

"Sec. 241. Creoles who have been educated in the higher educational institutions in Russia at the company's expense, and who have received degrees as students or doctors of medicine, or military

or civil rank, shall not refuse to remain and serve in the colonies, and shall receive from the company an adequate compensation and their subsistence for a period of ten years, after which time they shall have the right to leave the colonies, if they so desire, provided they be not in debt to the company.

"Sec. 242. Those who have learned a trade in Russia at the expense of the company, shall serve in the colonies not less than ten years, after which they may, if they desire so to do, leave the colonies and follow their handicrafts in other places.

"Sec. 243. Creoles educated in the colonies at the expense of the company shall remain in the service of the company not less than fifteen years, beginning from the age of seventeen years, at the expiration of which period they may, according to their wishes, pursue other avocations, and shall also have the right to leave the colonies.

"Sec. 244. Having once left the colonies, creoles shall forego the right to demand aid of the company, and while residing in Russia shall be required to gain their livelihood by their own exertions; the company shall be bound only to transport them from the colonies and to assign them traveling expenses, on the same terms as apply to persons leaving the colonial service and who have been employed in similar capacities.

"Sec. 245. Creoles who have elected to follow an independent means of livelihood, and who desire to establish themselves in the colonies, shall be regarded as colonial civilians, with the privileges enumerated in the preceding article.

"Sec. 246. Illegitimate children of creoles shall be provided for and educated at the expense of the company, under the supervision of the colonial government.

"ARTICLE 4.

"Of the Settled Tribes.

"Sec. 247. The settled tribes in the colonies include the inhabitants of the Kuril Islands, the Aleutian Islands, Kadiak, and the adjacent islands, and the Alaska peninsula; as also, the natives living on the shores of America, such as the Kenai natives, the Chugach, etc.

"Sec. 248. The settled tribes professing the Christian belief are not designated by any special name; those professing the native faith shall be styled, for the purpose of discrimination, 'settled tribes of other religions.'

"Sec. 249. These people are recognized by the government,—equally with all the others,—as Russian subjects. So long as they remain in the colonies they shall constitute a distinct rank of people, and shall not be entitled, by meritorious service, or for any other cause, to pass into another condition.

· "Sec. 250. As Russian subjects, they shall conform to the common laws of the government and shall enjoy the protection thereof."

The charter also provided for the election of chiefs in the settled tribes, and for the settlement of disputes; it being provided that a Russian superintendent and the chief should constitute a tribunal for that purpose. Their villages were to be concentrated, that the natives might have the advantages of "ordinary civilized life." The Russian matrimonial state was enforced, and section 262 provided that:

"Sec. 262. The superintendents and chiefs will be expected to set a good example in the matter of obeying and carrying into practice the teachings of the church, as well as in upright conduct and commendable industry."

Humane and sensible provisions governed the relations of the settled tribes toward the National Church.

"Sec. 271. Natives who do not profess the Christian faith shall be permitted to carry on their devotions according to their own rites.

"Sec. 272. The Russian clergy in making converts among the natives shall use conciliatory and persuasive measures, in no case resorting to coercion.

"Sec. 273. The colonial authorities shall see that the natives are not embarrassed under pretext of conversion to the Christian faith.

"Sec. 274. Natives professing the Christian faith, who, through ignorance, may transgress the ecclesiastical regulations, shall not be subject to fines and punishment,—instruction and persuasion are the only proper remedies in such cases.

"Sec. 275. All sales and donations of furs are absolutely prohibited, save in favor of the church and charitable institutions; furs presented to these as an equivalent for cash shall revert to the company, which shall pay the established price therefor."

· Property rights were protected, and a mixed tribunal was provided for determining such litigation, and appeals allowed as follows:

"Sec. 276. Controversies in regard to property shall be adjusted, in the case of the tribes subject to Russia, by the local chiefs and superintendents.

"Sec. 277. Disputes of Russians and creoles among themselves or with natives, or of these latter with their chiefs, shall be examined

into and decided by the officials of the company,—superintendents of districts, islands, redoubts, etc. Where one of the disputants is a native, the chief of the village or tribe to which such native belongs shall, at the request of the local authorities, be present at the investigation and settlement of the controversy.

"Sec. 278. From the decisions of the chiefs and the company's superintendents an appeal lies to the Governor of the colony, and shall be presented in person to the Governor or his deputy when on their tours of inspection through the colony, or may be handed in through the local office.

"Sec. 279. The Governor shall decide all controversies in relation to property in the colonies, under the provisions of section 149; but Russians, creoles, and natives shall have the right of appeal to the Supreme Senate, after departure from the colony and after six months' time, pursuant to section 13 of this charter. Such six months' term shall not be reckoned from the date of departure from the colonies, but from the time of arrival of the appellants or their attorneys in the Empire, or in such parts thereof as possess regularly organized courts."

The foregoing provisions apply to the settled tribes who lived in permanent villages in fixed habitations, and who were, wholly or in greater part, members of the established Russian Church. The Russians recognized a wide difference between these people, with whom they intermarried and lived on terms of intimacy, and the uncivilized native tribes—the pagan tribes. These were provided for in an additional article as follows:

"ARTICLE 5.

"Tribes Not Wholly Dependent on the Colonial Authority, but Living in the Colonial Possessions.

"Sec. 280. The tribes dwelling within the boundaries of the Russian colonies, but not wholly dependent, shall enjoy the protection of the colonial administration only on making request therefor, and when such request is deemed worthy of consideration.

"Sec. 281. The colonial government shall not forcibly extend the possessions of the company in regions inhabited by tribes not dependent on the colonial authority.

"Sec. 283. The company shall be prohibited from demanding from these people tribute, taxes, or donations of any kind whatsoever, and, in times of peace, shall not forcibly take any of them away from their own race, save only the hostages given under the usage heretofore existing. The hostages shall be kept in comfort, and the superintend-

ents shall exercise especial vigilance that no insult be offered them.

"Sec. 284. In the event of any of these people desiring to move into localities occupied by the settled tribes, the colonial administration shall permit such migration, if it shall appear that the colonies will not thereby be endangered. Such immigrants shall be received into the number of the settled tribes and shall enjoy the rights and immunities granted to that class of persons.

"Sec. 285. The relations of the colonial administration with the independent tribes shall be limited to the exchange, by mutual consent, of European wares for furs and native products."

It appears, then, that the imperial law recognized the Russian colonists in Alaska, their creole children, and those settled tribes who embraced the Christian faith, as Russian subjects; those tribes not wholly dependent—the independent tribes of pagan faith who acknowledged no restraint from the Russians, and practised their ancient customs—were classed as uncivilized native tribes by the Russian laws. Those laws and these social conditions continued to exist at the date of the treaty of cession in 1867. The settled tribes lived, as they and their descendants do now, at Unalaska, Belkofski, Unga, Kadiak, Kenai, Seldovia, Nuchek, Tatitlek, and other points from the outer Aleutian Islands to Yakutat Bay; as also at Ft. Alexander, at the head of Bristol Bay, at St. Michael, on Bering Sea, at the Russian mission, and Nulato, on the Yukon river. At these and other colonies or trading posts they gathered in permanent villages; they supported a Russian church, attended and assisted in its service, and practised the moral precepts taught therein. Their children also attended schools taught by the missionaries, and many of them acquired a liberal education. A full-blood Aleut was the engraver of the charts in Tebienkof's Atlas of the Russian Possessions in America. Many of the creoles rose to official rank in the service of the Russian-American Company as navigators and traders, and one of them (Etolin) became the Governor of the colony. Many clergymen of the established church and officers of the government married creole females. With a strength of

character inherited from the paternal stock, a dark though olive skin, an intelligent but languishing eye, a rounded and graceful form, and a mentality above the average, they resembled the creoles of more southern countries, were thought by the Russians to be beautiful, and generally made model wives and mothers. It was these people (Russian colonists, creoles, and settled tribes, members of her national church) whom Russia engaged the United States to admit as citizens, and to maintain and protect "in the free enjoyment of their liberty, property, and religion."

The question of the social status of these people, from an ethnological point of view, was submitted by me to Professor W. H. Dall, of the Smithsonian Institution, a long-time resident of Alaska, and one of the recognized authorities upon the ethnology of its native people. After carefully reviewing the conditions, he concludes as follows:

"To sum up, I should regard as having the civilized status, within the meaning of the treaty, the Aleuts, the Kadiak, Cook Inlet, Peninsular, and Prince William Sound Eskimo, all of whom are Christians or members of the Greek Christian church, all of whom were subject to taxation under Russian rule, and were regarded by the Russian law as subjects."

He also includes with these the "mission settlements on the lower Yukon." It is my judgment that the Russian colonists above described, their creole descendants, and the settled tribes, designated in the imperial ukase of 1844, both from an ethnological and a legal standpoint, were civilized people at the date of the treaty of cession to the United States, and upon accepting its provisions became, ipso facto, citizens of the United States. And of this stock is the applicant, the son of the Russian trader at St. Michael and an Eskimo mother, all of whom were members of the Greek Church and subjects of Russia at the date of the treaty. The "uncivilized native tribes," excluded from the naturalization benefits of the third

article of the treaty, were those independent pagan tribes who acknowledged no allegiance to Russia, and lived the wild life of their savage ancestors.

Another phase of the case, however, must be noticed. It may be thought that the status given to these people by the imperial ukase is not binding upon the United States, and that their rights are to be measured by our laws, and not by those of Russia. In re Camille (C. C.) 6 Sawy. 541, 6 Fed. 256, the United States Circuit Court held that a person of half white and half Indian blood was not a "white person," within the meaning of this phrase as used in the naturalization laws, and was not entitled, as the laws then stood, to be admitted to citizenship in the United States. In section 142 of the Penal Code of Alaska (page 30, Carter's Annotated Codes), in the act making it a crime to sell liquor to Indians, it is enacted:

"That the term 'Indian' in this act shall be so construed as to include the aboriginal races inhabiting Alaska when annexed to the United States, and their descendants of the whole or half blood."

Since the date of the decision in Re Camille, however, more liberal laws have been enacted by Congress, having in view the naturalization of Indians who have adopted the habits of civilized life; and if these apply to Alaska they afford ground for declaring the applicant to be a citizen, even though he is a half-breed Indian.

The third article of the treaty expressly excludes from the benefit of the naturalization stipulated therein the "uncivilized native tribes," but the same section contains this concluding sentence:

"The uncivilized tribes will be subject to such laws and regulations as the United States may from time to time adopt in regard to aboriginal tribes of that country."

The meaning of this sentence in a treaty between Russia and the United States is clear; it was intended to and does extend all general laws and regulations which the United States may

from time to time adopt in regard to the Indian tribes of the United States to and over the Indian tribes of Alaska. Upon its ratification and its further approval by Congress, this treaty and this clause became the supreme law of the land. It gave the Indian tribes of Alaska the same status before the law as those of the United States, and, unless a different intention appears upon the face of the law, extends all Acts of Congress, applicable and of a general nature, relating to the Indians of the United States, to Alaska. It becomes necessary, then, to inquire how far the laws and regulations from time to time adopted by the United States in regard to its aboriginal tribes have naturalized members of what were in 1867 the "uncivilized native tribes" of Alaska, and particularly as they relate to this applicant when considered as an Indian half-breed.

In 1887, in line with its previous policy to encourage Indians to settle upon the public domain and lands reserved for their use, to adopt the habits of civilized life, and to become self-supporting, Congress passed "An act to provide for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the territories over the Indians, and for other purposes." Act Feb. 8, 1887, 24 Stat. 388, c. 119. It is a humane and beneficent law, dictated by the same enlightened and elevating policy which gave freedom to the negro of the United States and the serf of Russia. The act generally provides for the allotment of reservations, but its fourth section provides:

"Sec. 4. That when any Indian not residing upon a reservation, or for whose tribe no reservation has been provided by treaty, act of Congress, or executive order, shall make settlement upon any surveyed or unsurveyed lands of the United States, not otherwise appropriated, he or she shall be entitled, upon application to the local land office for the district in which the lands are located, to have the same allotted to him or her, and to his or her children, in quantities and manner as provided in this act for Indians residing upon reservations," etc.

Section 6 of this act, however, is the one which extends the benefits of the law and naturalization to the Indian, and reads as follows:

"Sec. 6. That upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside; and no territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law.

"And every Indian born within the territorial limits of the United States to whom allotments shall have been made under the provisions of this act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property."

The applicant in this case was not born within the territorial limits of the United States, but he is nevertheless entitled to the benefit of the naturalization clause in this section by virtue of the treaty promise, approved by Congress, that he shall be subject to such laws and regulations as the United States may from time to time adopt in regard to aboriginal tribes of that country. His son, born since 1867, and now 21 years of age, is clearly entitled, as one born within the territorial limits, to the benefits of the act. It follows that the father is entitled to enjoy an equal right with the son, else the treaty provision fails to receive that execution which the honor of our country and its express terms demand. This section declares that he "shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside; and no territory shall pass or enforce any law denying

any such Indian within its jurisdiction the equal protection of the law." Alaska has been one of the territories of the United States ever since the ratification of the treaty of cession in 1867, and the passage of the act of Congress extending over it the jurisdiction of the United States courts of California, Oregon, and Washington. 15 Stat. 241, c. 273; Act July 27, 1868; In re Coquitlam, 163 U. S. 346, 16 Sup. Ct. 1117, 41 L. Ed. 184. Ever since that date it has been incorporated within the territorial limits of the United States. Downes v. Bidwell, supra. Being entitled by virtue of the treaty to the same benefits as an Indian born within the territorial limits of the United States, the applicant, even if considered to be a half-breed Indian, is a citizen of the United States, for he shows to the satisfaction of the court, by the evidence of his witnesses, that he has "voluntarily taken up within said limits his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life."

It also appears in evidence that Minook is married to an Indian woman, and it is interesting, if not necessary, to note that, if he be classed as a white man by virtue of his Russian parentage, then the laws of the United States also declare his wife to be "by such marriage a citizen of the United States, with all the rights, privileges, and immunities of any such citizen, being a married woman." 25 Stat. 392, c. 818, Act Aug. 9, 1888. The same rule which extends benefits to the Indians of Alaska imposes burdens. By the ninth section of the act of Congress of March 3, 1885, it is provided:

"That immediately upon and after the date of the passage of this act, all Indians, committing against the person or property of another Indian or other person any of the following crimes, namely, murder, manslaughter, rape, assault with intent to kill, arson, burglary, and larceny within any territory of the United States, and either within or without an Indian reservation, shall be subject therefor to the laws of such territory relating to said crimes, and shall be tried therefor in the same courts and in the same manner and shall be subject to the same penalties as are all other persons charged with

the commission of said crimes, respectively; and the said courts are hereby given jurisdiction in all such cases." 23 Stat. 385, c. 341.

In conclusion, it is my judgment that the applicant is a citizen of the United States by virtue of the third article of the treaty with Russia ceding Alaska to the United States, either as one of those "inhabitants" who accepted the benefits of the proffered naturalization, or as a member of an "uncivilized native tribe" who has since that date voluntarily taken up "his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life." He was such citizen at the time of making his application to this court, and because the court can add nothing to his status as a citizen his application is denied.