METLAKATLA INDIAN COMMUNITY, AN-
NETTE ISLAND RESERVE, a Federally
Chartered Corporation; Organized Village
of Kake; and Angoon Community Associa-
tion, Appellants,

v.

William A. EGAN, Governor of the State of
Alaska, and The State of Alaska,
Appellees.

Nos. 21–23.

Supreme Court of Alaska.

June 2, 1961.

See also 354 P.2d 1108.

Richard Schifter, Washington, D. C., Theodore H. Little, Clarkston, Wash., N. C. Banfield, Juneau, for appellant, Metlakatla Indian Community.

John W. Cragun, Washington, D. C., N. C. Banfield, Juneau, for appellants, Organized Village of Kake and Angoon Community Assn.

Ralph E. Moody, Atty. Gen. of Alaksa, Douglas L. Gregg, special counsel to Governor, Juneau, Perry W. Morton, U. S. Asst. Atty. Gen., for appellees.

Roger P. Marquis, Dept. of Justice, Washington,. D. C., for the United States, amicus curiae.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

NESBETT, Chief Justice.

These controversies arose out of the determination of the State of Alaska to prohibit the use of all fish traps for the taking of salmon for commercial purposes in all the coastal waters of the state. Appellants contended that their fish traps were exceptions to the prohibitions contained in the constitution and laws of Alaska because their operation had been authorized by the Secretary of the Interior of the United States, who, they claimed, had the exclusive right to regulate fishing by Indians in Alaska. The United States District Court for the District (Territory) of Alaska in Juneau, on July 2, 1959, 174 F.Supp. 500, acting as an interim or transitional state court, dismissed appellants' suits to enjoin the state from enforcing acts making it a crime to erect, moor, maintain or operate a fish trap. That court denied appellants' motions for preliminary injunctions pending appeal to the Supreme Court of the United States. The Supreme Court of Alaska had not yet been organized. Mr. Justice Brennan, on July 11, 1959, granted a stay pending appeal to the United States Supreme Court.[1] On June 20, 1960, the United States Supreme Court in an opinion reserved decision on the merits of the appeals and directed appellants to pursue their dormant pending appeals in the then existing Supreme Court of Alaska in order to give that court an opportunity to rule on questions open to it for decision.[2] This court has jurisdiction to hear appeals from final judgments concerning state matters rendered in the United States District Court for the District (Territory) of Alaska after January 3, 1959[3] and accepts jurisdiction of these appeals.

1. Organized Village of Kake v. Egan, 1959, 80 S.Ct. 33, 4 L.Ed.2d 34.

2. Metlakatla Indian Community, Annette Island Reserve v. Egan (Organized Village of Kake v. Egan), 1960, 363 U.S. 555, 80 S.Ct. 1321, 4 L.Ed.2d 1397.

3. Hanover Fire Ins. Co. of New York v. Bennett, Alaska 1960, 348 P.2d 587.

The historical basis for the attitude of the state toward fish traps as well as the nature of the fish trap itself will be discussed briefly before attempting to deal with the many issues presented by these cases.

Since time immemorial Alaska has been blessed with a natural food resource in the form of annual migrations of salmon. From late spring until fall most of its fresh water rivers and streams are, at one time or another, visited by hordes of salmon that have migrated shoreward from the open sea. After periods varying from two to eight years at sea the homecoming salmon have increased in size from fingerlings to maturity and to weights ranging to sixty pounds and above in some species. As a life sustaining food the salmon is hardly exceled and because of its abundance in Alaskan waters it has always been one of the basic food resourses of the people as well as the basis of their main industry. Responding to instinct the sea matured salmon seasonally form in huge schools in the sea enroute to the mouths of the fresh water rivers and streams they will soon enter. At a time dictated by instinct, but governed to some extent by water conditions and other factors, the schools then commence a mass movement from the sea toward the mouths of the rivers and streams. It is at this point in their migration that they are caught in great quantities by the fishing methods to be mentioned. Those escaping nets and traps proceed up the rivers and tributary streams to the place of their spawning where they in turn spawn and with few exceptions die.[4]

Harvesting some portion of this natural resource for food has always been an annual necessity for most of the native population and many of the white settlers. Commercial salmon fishing is the principal source of income for a large portion of Alaska's labor force. With the coming of the white man primitive methods of catching salmon gave way to what are generally considered the three most efficient methods: (1) gill nets—consisting of lengths of net strung between buoys secured to the tidelands floor by lines and stakes, with the nets usually going dry at low tide; (2) purse seines—where nets are maneuvered around congregations of fish in deep water by the use of powered boats; (3) fish traps—unquestionably the most productive method of catching salmon ever used. A trap consists of tall stakes or mechanically driven piling extending from the shore to varying distances seaward, depending on the depth of the water. Wire or webbing is stretched across the stakes or piling from the shore to the seaward end and from the ocean bottom upward to a point above high water. Located at the seaward end is an extended wing or hook and an opening into the heart and pot. When the webbing is on the ocean bottom fish cannot pass around the trap at the shoreward end. One tendency of migrating fish is to parallel the shoreline and travel with the incoming tide. Fish stopped by the webbing of a trap will eventually follow it seaward in an attempt to by-pass the obstruction. The wing or hook is constructed so as to discourage by-passing and divert the fish into the heart and pot where they remain. With some variations in construction, floating traps adapted to deep water are commonly used and are highly productive.

Public opposition to the trap appeared in Alaska when it became obvious that the fishery resource was being depleted.[5] Opponents claimed that traps wiped out entire schools of salmon headed for specific streams; that even when this did not happen they trapped an excessive percentage of the

4. See Barnaby, Fluctuations in Abundance of Red Salmon of the Karluk River, Alaska 247–60 (Fishery Bulletin No. 39, 1944) (from 50 Fishery Bulletin of the Fish and Wildlife Service 237–95).

5. Statistics contained in the International Yearbook Number of Pacific Fisherman, Jan. 25, 1961, p. 27, show that commencing with a total pack of 1,894,516 cases in 1905 the fisheries of Alaska were exploited to a peak pack of 8,454,948 cases of salmon in 1936. From 1936 onward the total pack gradually decreased to 1,778,339 cases in 1959, the lowest in the history of the industry. The total pack in 1960 was 2,550,027 cases.

fish of a given school; that they trapped not only salmon but also fish of many other species, which, once trapped, died in the pot without being utilized for any purpose. Proponents, on the other hand, argued that the very efficiency of traps commended their use; that they produced a more marketable product because the fish were killed with less violence and reached the cannery sooner and fresher; and that the dwindling yearly salmon runs were the result of overfishing by all methods.

The authority granted to the Territory of Alaska by the Organic Act of 1912[6] did not extend to the regulation of fish and game. From 1906 until 1924 such regulation of the Alaska fisheries as occurred was directed by the Secretary of Commerce.[7] The White Act of June 6, 1924,[8] broadened the scope of the regulatory power. Under Reorganization Plan No. II in 1939 the responsibility for administering the act was transferred to the Secretary of the Interior.[9] The use of fish traps was permitted by regulation along specific areas of the coastline. The right to construct and operate a trap in any area declared to be available for trap fishing was open to all. Trap sites were never designated by the Secretary as belonging to any person or group prior to his granting of trap site privileges to appellants on March 7, 1959. The spacing between traps, and other regulations prescribed, resulted in limiting the number of trap site locations available within a given area. The legal prerequisites to operating a fish trap were that the trap be located in an area open to the use of traps, that the operator have a War Department permit to construct an obstruction to navigation, and after the Territory was organized, a fish trap license issued by the Territory of Alaska. The annual cost of constructing a trap varied between several thousand dollars for a hand driven stake trap to in excess of ten thousand dollars for a pile driven trap. The cost of construction and operation excluded the average Alaska fisherman from its use and in time the operation of fish traps became generally concentrated in the cannery operators and owners, it not being uncommon for a cannery corporation to own several dozen traps.[10] Fish traps were bought and sold. With few exceptions the right of the purchaser to annually erect and operate the trap on the tideland location previously occupied by the seller was not questioned by other persons because of a custom and usage observed by Alaska fishermen, that if the person who fished a given tideland location the previous year timely returned and prepared to fish that location the following year, his moral priority would be respected. Legally, all that could be sold was the apparatus and equipment used in the trap. Alaska courts have consistently held that no person could acquire a vested right in a tideland fishing location and that the first person to timely commence the erection of a trap was entitled to fish that location for that year, if the trap was completed and ready to fish on the opening day of the season.[11] The same customs were generally observed and the same law, with slight variations, governed with regard to gill net tideland fishing sites.[12] The only instance, prior to Statehood, of an acquisition by any person or group of an exclusive right to operate a fish trap in Alaska waters is that which came to the Metlakatla Indians through a combination of unusual circum-

6. 37 Stat. 512, 48 U.S.C.A. § 24 (Supp. 1960) [§ 4-2-3 A.C.L.A.Cum.Supp.1957].

7. Act of June 14, 1906, ch. 3299, § 5, 34 Stat. 264, 48 U.S.C.A. § 247.

8. 43 Stat. 464, 48 U.S.C.A. § 221 (1952).

9. 1939 Reorganization Plan No. II, 53 Stat. 1433, 5 U.S.C.A. following section 133t.

10. Gruening, The State of Alaska 395 (1954).

11. Fisher v. Everett, D.C.D.Alaska 1945, 66 F.Supp. 540, 11 Alaska 1; General Fish Co. v. Markley, D.C.D.Alaska 1952, 105 F.Supp. 968, 13 Alaska 700; Thlinket Packing Co. v. Harris & Co., D.C.D. Alaska 1916, 5 Alaska 471.

12. Lind v. Markley, D.C.D.Alaska 1952, 105 F.Supp. 50, 13 Alaska 665.

stances, which will be discussed later in this opinion.

The very first session of the Alaska Territorial Legislature in 1913 memorialized Congress for legislation which would limit the fishing efficiency of the trap.[13] In 1913, 1915, and regularly thereafter, the Territorial Legislature memorialized Congress that no legislation be enacted whereby any right or title to any fish trap site in Alaska waters be granted.[14] In 1921 the Territorial Legislature memorialized Congress, attributing the diminishing salmon supply to the use of fish traps and requesting regulation of that method of fishing.[15] In 1924 Mr. Sutherland, Alaska's delegate to Congress, testified before a Congressional Committee during hearings on the White Act as follows:

"* * * when the fish are congregated in one body moving toward the parent stream if by accident they come in contact with a trap lead and the lead fish enters the trap it is more than probable that the entire supply of that stream to the last fish is taken, and therefore a great many of the smaller streams in Alaska are barren of fish, and any number of men in Alaska will tell you by the method of the trap the entire supply is exterminated." [16]

The number of fish traps permitted under the Secretary's regulations ran into the several hundreds. Regular memorials to Congress recommending complete abolition of fish traps were passed by the Alaska Territorial Legislature commencing in 1931.[17] At least one unsuccessful attempt was made to tax the fish trap out of use.[18] In 1948 a referendum by the people of Alaska resulted in a vote of 19,712 to 2,624 in favor of abolition of fish traps.

On February 5, 1956, the Alaska Constitutional Convention adopted the Constitution of Alaska. Article VIII, section 15 stated:

"No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State."

Ordinance No. 3 of that constitution, Laws 1959, p. 54, dealt exclusively with fish traps and provided that each elector who voted on ratification of the constitution could, on the same ballot, vote for or against adoption of Ordinance No. 3, which prohibited the use of fish traps for the taking of salmon for commercial purposes in the coastal waters of the state. The ordinance provided that if it were adopted by a majority vote, then on the effective date of the constitution the following should become operative:

"As a matter of immediate public necessity, to relieve economic distress among individual fishermen and those dependent upon them for a livelihood, to conserve the rapidly dwindling supply of salmon in Alaska, to insure fair competition among those engaged in commercial fishing, and to make manifest the will of the people of Alaska, the use of fish traps for the taking of salmon for commercial purposes is hereby prohibited in all the coastal waters of the State."

The vote of the people of Alaska on April 24, 1956 was 21,285 to 4,004 in favor of adopting Ordinance No. 3.

On July 7, 1958, Congress passed the Alaska Statehood Act providing for the

---

13. S.L.A.1913, Senate Joint Memorial No. 26, at page 413.

14. S.L.A.1915, Senate Joint Memorial No. 16, at page 222.

15. S.L.A.1921, House Memorial No. 1, at page 181.

16. 65 Cong.Rec. 5966 (1924).

17. S.L.A.1931, House Joint Memorial No. 6, at page 275, points out the prejudi-

cial effect on the development of the Territory caused by the use of floating and standing fish traps and requests that the power to determine the methods to be employed in catching salmon be given to the Territorial Legislature.

18. P. E. Harris & Co. v. Mullaney, D.C. D.Alaska 1949, 87 F.Supp. 248, 12 Alaska 476, 480.

admission of Alaska into the Union.[19] Section 6(e) [20] of this act provided in part that the administration and management of the fish and wildlife resources of Alaska should be retained by the federal government, under existing laws, until the first day of the first calendar year following the expiration of ninety legislative days after the Secretary of the Interior had certified to the Congress that the Alaska State Legislature had made adequate provision for the administration, management, and conservation of the said resources in the broad national interest.

Alaska became a state on January 3, 1959.[21] The Alaska State Legislature met immediately thereafter and on February 25, 1959 a law became effective making it unlawful to erect, moor or maintain fish traps.[22] On March 7, 1959 the Secretary of the Interior issued an order prohibiting the use of fish traps in Alaska, to be effective on April 18, 1959,[23] but excluding fish traps at Metlakatla, Kake and Angoon as enumerated, a total of eleven traps. The order recited as its authority, section 1 of the White Act.[24] The Secretary's theory was that under section 6(e) of the Alaska Statehood Act [25] he was required to manage Alaska's fish and wildlife until the state took over that responsibility, that on January 3, 1959 when the act became effective, Ordinance No. 3 also became effective and required that he abolish all fish traps in Alaska since he was acting in a dual capacity as trustee-administrator to enforce the laws of the state and federal government. The Secretary interpreted the wording "under existing laws" in section 6(e) as including Ordinance No. 3, which, under his theory, amended the White Act. The Secretary's action and views were upheld.[26] The validity of his act in excluding appellants' traps from the effect of the order was not before the court.

On April 17, 1959 a comprehensive act establishing an organization for the management of Alaska's fish and game resources was enacted by the first state legislature.[27] On the same date an act prohibiting the operation of fish traps within the state, amending the previous act on fish traps [28] and prescribing penalties became effective.[29] On May 21, 1959 the Governor of Alaska wrote to the Secretary of the Interior pointing out that Ordinance No. 3 prohibited fish traps, native owned or otherwise, that the state legislature had made operation of fish traps a crime, that regulation 115.26 of the order of March 7, 1959, permitting fish traps on the tidelands or submerged lands of Alaska would impair the sovereign rights of the State of Alaska

19. 72 Stat. 339 (1958), amended by 73 Stat. 141 (1959).

20. Quoted at page 921, infra.

21. Exec.Proclamation No. 3269, 24 Fed. Reg. 81 (1959), 48 U.S.C.A. preceding section 21 note.

22. S.L.A.1959, ch. 17 (quoted at page 922, infra).

23. 50 C.F.R. §§ 101.1–130.10 (Supp.1960) (commercial fisheries regulations for Alaska).

24. 43 Stat. 464 (1924), 48 U.S.C.A. § 221 (1952):
"For the purpose of protecting and conserving the fisheries of the United States in all waters of Alaska the Secretary of the Interior from time to time may set apart and reserve fishing areas in any of the waters of Alaska over which the United States has jurisdiction, and within such areas may establish closed seasons during which fishing may be limited or prohibited as he may prescribe. Under this authority to limit fishing in any area so set apart and reserved the Secretary may (a) fix the size and character of nets, boats, traps, or other gear and appliances to be used therein; (b) limit the catch of fish to be taken from any area; (c) make such regulations as to time, means, methods, and extent of fishing as he may deem advisable."

25. Quoted at page 921, infra.

26. Ketchikan Packing Co. v. Seaton, 1959, 105 U.S.App.D.C. 383, 267 F.2d 660.

27. S.L.A.1959, ch. 94.

28. S.L.A.1959, ch. 17 (quoted at page 922, infra).

29. S.L.A.1959, ch. 95 (quoted at page 923, infra).

and that state officials had been instructed to enforce the constitution and laws. He

asked that the Secretary reconsider regulation 115.26.[30]

30. "May 21, 1959
"Honorable Fred A. Seaton
"Secretary of the Interior
"Department of the Interior
"Washington, D. C.
"Dear Mr. Secretary:
"On March 7, 1959, you promulgated your amendments to the Alaska Fishery Regulation. Among the revision of regulations adopted was Section 115.26. The purpose of Section 115.26 Revised Regulation was to permit certain native owned or controlled fish traps to operate within Alaskan waters.
"Fish traps, native owned or otherwise, are prohibited by the Constitution of the State of Alaska:
" 'As a matter of immediate public necessity, to relieve economic distress among individual fishermen and those dependent upon them for a livelihood, to conserve the rapidly dwindling supply of salmon in Alaska, to insure fair competition among those engaged in commercial fishing, and to make manifest the will of the people of Alaska, the use of fish traps for [the] taking of salmon for commercial purposes is hereby prohibited in all [the] coastal waters of the State.'
"The Legislature of the State of Alaska has made operation of fish traps a crime within the State:
" 'Section 1. It shall be unlawful to erect, moor, or maintain fish traps, including but not limited to floating, pile-driven or hand-driven fish traps, on or over any lands, tidelands, submerged lands or waters owned or hereafter acquired by the State of Alaska. Nothing in this section shall prevent the maintenance, use or operation of small, hand-driven fish traps of the type ordinarily used on rivers of Alaska which are otherwise legally maintained and operated in or above the mouth of any stream or river in Alaska.
*　*　*　*　*
" 'Sec[tion] 3. A violation of this Act shall be a misdemeanor and shall be punishable by imprisonment not to exceed one year or by fine not to exceed $5,-000.00 or by both such imprisonment and fine.' (Chapter 95, SLA 1959).
"The will of the people of Alaska to rid our waters of fish traps has been demonstrated repeatedly. In every referendum on the question, the Alaskan people have voted overwhelmingly to abolish the fish traps.
"When the matter was submitted last to the electorate on the adoption of the

State Constitution, the returns indicated that Alaskans had in no manner receded from their position.
"In the 1948 referendum, the Village of Kake voted 123 to 6; Angoon, 41 to 9; and Metlakatla, 112 to 33; for abolition of fish traps. These are the several native villages where you would now permit fish traps. These villages voted more recently against fish traps when that issue was referred to the people of Alaska in 1956.
"Since becoming Governor of Alaska, I have repeatedly announced that fish traps will not be permitted within the waters of Alaska. I have made no exceptions. These announcements have been carried in the press.
"As chief executive of the State of Alaska, I must enforce the Constitution and laws of the State. Since no exception is made either in the Constitution or the statutes of Alaska, no discretion is conferred on the executive.
"The Court of Appeals for the District of Columbia Circuit, No. 15075, in Ketchikan Packing Company, et al. vs. Fred A. Seaton, et al., has this to say:
" 'The Secretary read the words "under existing laws" in the Westland proviso as including Ordinance [No.] 3 of Alaska, and concluded that the Statehood Act which "accepted, ratified and confirmed" the Alaska Constitution, amended the White Act by prohibiting the use of such traps in Alaskan waters as set forth in the ordinance. In other words, the Secretary argues that the Congress did not intend that he should suspend the Alaskan ordinance, adopted by popular vote along with the Constitution, in the interim period while he administered the state's wildlife resources.
" 'One key consideration in the problem is that we are dealing with a transition measure—a temporary, not a permanent, provision. What was the intention of Congress concerning the interim transition period between federal territorial control and full statehood? In effect, the Westland proviso makes the Secretary a "trustee" for both the federal government and the new state "in [the] broad national interest" during the transition of administration from the federal to the state authorities. The Secretary, in that unique capacity, could not reasonably *disregard a valid law of Alaska* which was "existing" on January 3, 1959, the effective date of the Alaska

On or about June 17, 1959 state officers arrested several persons and seized one trap on which pre-season work was being performed. Actions for restraining orders were immediately commenced by appellants in the United States District Court for the District (Territory) of Alaska in Juneau.

After dismissal in that court, notices of appeal were filed with the Supreme Court of the United States on August 6, 1959. Notices of appeal were filed in this court as a precautionary matter after its organization. On February 19, 1960 an order was entered by this court holding all proceedings on the appeals in abeyance pending determination by the Supreme Court of the United States of the question of its jurisdiction over the appeals then pending in that court.

All three appellants contend that the Alaska constitution and statutes prohibiting fish traps are not applicable to them because, in adopting the constitution, the people of Alaska disclaimed right or title in or jurisdiction over Indian fishing rights and that the Alaska Statehood Act reserved absolute jurisdiction and control over Indian fishing rights to the United States.

Since most of the issues turn on the question of what rights Alaska disclaimed with respect to native fishing rights, we shall first address ourselves to that question in the knowledge that its answer will simplify solution of the other issues.

The road to Statehood for Alaska was long and difficult. The first bill providing for Statehood for Alaska was introduced in Congress in 1916. The first memorial to Congress from the Territorial Legislature petitioning for Statehood was passed in 1945.[31] Regular petitions were made thereafter without success. Finally, in 1955 the Territorial Legislature provided for a constitutional convention.[32] Elected delegates adopted a constitution on February 5, 1956 which was ratified by the people on April 24, 1956. This constitution served as a basis for subsequent petitions to Congress for Statehood and can be considered as an offer to accept the privileges and responsi-

Statehood Act which defined his powers over wildlife resources for the interim period commencing on that date.' (Emphasis supplied.)

"In its conclusion, the Court said:

" 'Of necessity, in this unique interim situation, the Secretary must apply a federal sanction to effect the *enforcement of a state law.* See footnote 3 *supra.* This apparent anomaly can be explained only by reference to the fact that in this transition of authority the Secretary is operating in a dual capacity.' (Emphasis supplied.)

"I have considered Section 4 of the Enabling Act (Public Law 85–508) which refers to native property (including fishing rights). My legal advisors have informed me that this provision protects the vested rights of natives. At no time in the courts of Alaska or elsewhere has fishing by traps been held to confer a vested or a property right.

"The fish traps which would be permitted under Revised Regulation 115.26 must be placed upon the tidelands or the submerged lands of Alaska. Therefore, the Regulation would impair or infringe upon sovereign rights of the State of Alaska.

"For the reasons here stated, I must now advise that I will stand firm in my resolve that fish traps will not be allowed within Alaskan waters. I have instructed the appropriate officers in the State to see that the State Constitution and law is enforced. If Revised Regulation 115.26 is left unchanged, it may mislead the native people who in reliance thereon may attempt to install or operate fish traps. I hope that loss of money and labor may be avoided. To that end, I ask that you reconsider Revised Regulation 115.26.

"I am convinced that continuing long term benefits far outweighing temporary gain will accrue to the very communities here involved by the early discontinuance of fish traps, and I submit to you that your announced intention last Fall to ban traps was applauded in these communities as it was elsewhere throughout Alaska.

"I shall be glad to discuss this matter with you personally or through authorized representatives at any time.

"Sincerely yours,

"William A. Egan

"Governor of Alaska"

31. S.L.A.1945, House Joint Memorial No. 7, at page 223; see S.L.A.1929, Senate Memorial No. 1, at page 321.

32. S.L.A.1955, ch. 46.

bilities of that status in accordance with its terms.[33] The disclaimer provisions relied upon by appellants are contained in sections 12 and 13 of article XII.[34]

Some two years and three months after the people of Alaska had adopted their constitution Congress passed the Alaska Statehood Act.[35] Section 1 provided that the State of Alaska would be admitted into the Union on an equal footing with the other states in all respects whatsoever, subject to the issuance of a proclamation required by section 8(c) of the act. Section 1 found that the Alaska constitution was republican in form, in conformity with the Constitution of the United States and the principles of the Declaration of Independence, "* * * and is hereby accepted, ratified, and confirmed".

Section 4 of the Alaska Statehood Act is a direct response by Congress to the provisions contained in the five sentences of section 12 of article XII of the Alaska constitution. The two sections constitute a compact between sovereigns.[36] For purposes of comparison, each sentence of section 12 of article XII of the Alaska constitution is separately quoted immediately above that portion of section 4 of the Alaska Statehood Act which represents Congress' response to that sentence:

"The State of Alaska and its people forever disclaim all right and title in or

to any property belonging to the United States, or subject to its disposition, and not granted or confirmed to the State or its political subdivisions, by or under the act admitting Alaska to the Union." First sentence, section 12, article XII, Alaska Constitution.

"As a compact with the United States said State and its people do agree and declare that they forever disclaim all right and title to any lands or other property not granted or confirmed to the State or its political subdivisions by or under the authority of this Act, the right or title to which is held by the United States or is subject to disposition by the United States, * * *." Section 4, Statehood Act.

A comparison of the offer with the response as above set forth indicates definite agreement as to the future status of United States property.

"The State and its people further disclaim all right or title in or to any property, including fishing rights, the right or title to which may be held by or for any Indian, Eskimo, or Aleut, or community thereof, as that right or title is defined in the act of admission." Second sentence, section 12 of article XII, Alaska Constitution.

"* * * and to any lands or other property (including fishing rights), the

33. Boeing Aircraft Co. v. R. F. C., 25 Wash.2d 652, 171 P.2d 838, 842, 168 A.L.R. 539, appeal dismissed Boeing Aircraft Co. v. King County, Wash., 1947, 330 U.S. 803, 67 S.Ct. 972, 91 L.Ed. 1262.

34. "Section 12. The State of Alaska and its people forever disclaim all right and title in or to any property belonging to the United States, or subject to its disposition, and not granted or confirmed to the State or its political subdivisions, by or under the act admitting Alaska to the Union. The State and its people further disclaim all right or title in or to any property, including fishing rights, the right or title to which may be held by or for any Indian, Eskimo, or Aleut, or community thereof, as that right or title is defined in the act of admission. The State and its people agree that, unless otherwise provided by Congress, the

property, as described in this section, shall remain subject to the absolute disposition of the United States. They further agree that no taxes will be imposed upon any such property, until otherwise provided by the Congress. This tax exemption shall not apply to property held by individuals in fee without restrictions on alienation.

"Section 13. All provisions of the act admitting Alaska to the Union which reserve rights or powers to the United States, as well as those prescribing the terms or conditions of the grants of lands or other property, are consented to fully by the State and its people."

35. 72 Stat. 339 (1958), amended by 73 Stat. 141 (1959).

36. Boeing Aircraft Co. v. R. F. C., supra note 33.

right or title to which may be held by any Indians, Eskimos, or Aleuts (hereinafter called natives) or is held by the United States in trust for said natives; * * *." Section 4, Alaska Statehood Act.

A comparison between the offer and response does not indicate definite agreement. The offer to disclaim by the state was conditioned on definition in the act of admission of the right or title to be disclaimed. The response merely repeated the offer to disclaim. It did not comply with the condition by defining the right or title.

"The State and its people agree that, unless otherwise provided by Congress, the property, as described in this section, shall remain subject to the absolute disposition of the United States." Third sentence, section 12, article XII, Alaska Constitution.

"* * * that all such lands or other property, belonging to the United States or which may belong to said natives, shall be and remain under the absolute jurisdiction and control of the United States until disposed of under its authority, except to such extent as the Congress has prescribed or may hereafter prescribe, and except when held by individual natives in fee without restrictions on alienation * * *." Section 4, Alaska Statehood Act.

The above offer and response indicate agreement as to property, without specific mention of fishing rights.

"* * *. *Provided,* That nothing contained in this Act shall recognize, deny, enlarge, impair, or otherwise affect any claim against the United States, and any such claim shall be governed by the laws of the United States applicable thereto; and nothing in this Act is intended or shall be construed as a finding, interpretation, or construction by the Congress that any law applicable thereto authorizes, es-

tablishes, recognizes, or confirms the validity or invalidity of any such claim, and the determination of the applicability or effect of any law to any such claim shall be unaffected by anything in this Act: * * *."

This portion of section 4 of the Alaska Statehood Act has no direct relation to any of the sentences of section 12 of article XII of the constitution.[37]

"They further agree that no taxes will be imposed upon any such property, until otherwise provided by the Congress." Fourth sentence, section 12 of article XII, Alaska Constitution,

"This tax exemption shall not apply to property held by individuals in fee without restrictions on alienation." Fifth sentence, section 12 of article XII, Alaska Constitution.

"* * * And provided further, That no taxes shall be imposed by said State upon any lands or other property now owned or hereafter acquired by the United States or which, as hereinabove set forth, may belong to said natives, except to such extent as the Congress has prescribed or may hereafter prescribe, and except when held by individual natives in fee without restrictions on alienation." Section 4, Alaska Statehood Act.

The fourth and fifth sentences and the response appear to have sufficient definiteness to be offers and acceptances.

Section 13 of article XII of the Alaska constitution is construed to be a blanket consent by Alaska to such proper reservations of rights or powers to the United States as may be contained in the act admitting Alaska to the Union.

The compact or contract between Alaska and the United States became effective upon approval of the terms of the Alaska Statehood Act by the voters of Alaska.[38] Section 8(b) of the Alaska Statehood Act required that three propositions be submitted to the

---

37. See one explanation of the reason for this proviso on page 916 of this opinion.

38. Stearns v. State of Minnesota, 1900, 179 U.S. 223, 244–245, 21 S.Ct. 73, 45 L.Ed. 162, 174.

qualified voters of Alaska. Only the third proposition is of interest here.[39] This proposition was approved by a vote of 40,739 to 7,500 on August 26, 1958. On June 25, 1959 Congress enacted the Alaska Omnibus Act. Section 2(a) amended that portion of section 4 of the Alaska Statehood Act which was a response to the third sentence of section 12, article XII of the Alaska constitution.[40]

■ Appellants argue that the amendment is a part of the compact and merely clarified the original intent of Congress. We cannot accept this reasoning. It is our view that the amendment forms no part of the compact between Alaska and the United States. It was not enacted until ten months after the voters of Alaska had ratified the compact, six months after Alaska had attained Statehood, and three days after these controversies had arisen. This portion of section 4 reserves absolute jurisdiction and control in the United States. As originally enacted it applied only to "lands or other property". As amended, it purports to include fishing rights. In the portion of section 4 immediately preceding, fishing rights were parenthetically included. It is only logical to assume that if it had been intended that fishing rights be included in the section following, along with "lands or other property", the same phraseology would have been employed. The conciseness of and correlation between the pertinent sentences of the Alaska constitution and the responding portions of section 4 leave no room for the construction appellants urge.

What right or title to Indian fishing rights might the state have disclaimed under the terms of the second sentence of section 12, article XII and the responding portion of section 4, assuming there was a sufficient area of agreement to create a compact on this subject? The state offered to disclaim as to right or title "held" by or for the persons named. The response described the right or title as "held" by or for natives. There is no evidence of an intent on the part of either sovereign that any new or additional rights in fishing rights be established by the compact itself. The question then becomes one of what "right or title" to fishing rights was "held" at the time the compact was formed.

A review of all known legislation enacted by Congress since the purchase of Alaska from Russia that might have established a "right or title" in Alaska natives shows that Congress evidenced some concern for the natives by permitting them to kill fur seals for their needs,[41] and permitting them, along with miners, prospectors, explorers and travelers, to kill game out of season when in absolute need of food and no other food was available.[42] The Act of May 17,

---

39. "(3) All provisions of the Act of Congress approved ......................
 (date of approval of this Act)
 reserving rights or powers to the United States, as well as those prescribing the terms or conditions of the grants of lands or other property therein made to the State of Alaska, are consented to fully by said State and its people."

40. Alaska Omnibus Act § 2(a), 73 Stat. 141 (1959) reads:
 "Section 4 of the Act of July 7, 1958 (72 Stat. 339), providing for the admission of the State of Alaska into the Union, is amended by striking out the words 'all such lands or other property, belonging to the United States or which may belong to said natives', and inserting in lieu thereof the words 'all such lands or other property (including fishing rights), the right or title to which may be held by said natives or is held by the United States in trust for said natives'."

41. Act of April 22, 1874, ch. 122, 18 Stat. 33; Act of April 6, 1894, ch. 57, § 1, 28 Stat. 52; Act of April 21, 1910, ch. 183, § 6, 36 Stat. 327; Act of Aug. 24, 1912, ch. 373, § 3, 37 Stat. 500; Act of Feb. 26, 1944, ch. 65, § 3, 58 Stat. 101, 16 U.S.C.A. § 631c.

42. Act of June 7, 1902, ch. 1037, § 1, 32 Stat. 327, as amended by Act of May 11, 1908, ch. 162, § 1, 35 Stat. 102; Act of Jan. 13, 1925, ch. 75, § 10, 43 Stat. 744, as amended by Act of Feb. 14, 1931, ch. 185, § 10, 46 Stat. 1113 (exemption from license requirement), as amended by Act of June 25, 1938, ch. 686, § 4, 52 Stat. 1171, 48 U.S.C.A. § 199.

1884,[43] establishing a civil government in Alaska provided: .

"* * * That the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress."

This provision was not confined to Indians. The first act of Congress with respect to fisheries in Alaska was passed on June 14, 1906,[44] making it unlawful for a non-citizen, or one who had declared his intention but was a non-resident, or any company not organized under the laws of the United States or of a state, or any person not a native of Alaska, to catch fish except with rod, spear or gaff. In the same year the first act to regulate commercial fisheries was passed.[45] This act taxed fishing enterprises, exempting those who operated hatcheries for restocking, restricted the use of nets and seines, provided for closed periods and penalties for violations, but made no mention of the natives.

Section 1 of the White Act[46] stated that its purpose was that of "* * * protecting and conserving the fisheries of the United States in all waters of Alaska * * *." The Secretary of Commerce was required to regulate the fisheries,

"*Provided,* That every such regulation made by the Secretary of Commerce shall be of general application within the particular area to which it applies, and that no exclusive or several right of fishery shall be granted therein, *nor shall any citizen of the United States be denied the right to take, prepare, cure or preserve fish or shellfish in any area of the waters of Alaska where fishing is permitted by the Secretary of Commerce. * * *"* (Emphasis added.)

The emphasized portion of the above quoted section was generally the law of Alaska prior to enactment of the White Act.[47] This section precludes the possibility that the Secretary might have created any rights in natives subsequent to its enactment in 1924. On the only occasion that the Secretary of the Interior ever attempted to create an exclusive right of fishery in Alaskan Indians, with the exception of the cases under consideration, the United States Supreme Court said through Mr. Justice Reed:

"It would take specific and unambiguous legislation to cause us to rule that Congress intended to authorize the Secretary of the Interior to alienate the Alaska fisheries permanently from public control." [48]

In 1934 Congress, by amendment of earlier acts, permitted the taking of king salmon in the Kuskokwim and Yukon rivers for commercial purposes, but limited such taking to Indians and bona fide white inhabitants.[49]

■ Our search leads us to the belief that no act of Congress had established any "right or title" in fishing rights which were "held" by or for natives at the time the compact was made. Whatever hunting or fishing privileges Congress has extended to natives in the past have been equally applicable to the white residents. Natives and whites have always fished as equals in Alaska. This is understandable and is as it should have been. A remote wilderness could never have been populated to any extent with permanent white residents if they had not been accorded at least an equal

43. Ch. 53, § 8, 23 Stat. 25, 48 U.S.C.A. § 356.

44. Ch. 3299, 34 Stat. 263.

45. Act of June 26, 1906, ch. 3547, 34 Stat. 478, 48 U.S.C.A. § 230 et seq.

46. Ch. 272, 43 Stat. 464 (1924), 48 U.S. C.A. §§ 221, 222 (1952).

47. Thlinket Packing Co. v. Harris, D.C.D. Alaska 1916, 5 Alaska 471.

48. Hynes v. Grimes Packing Co., 1949, 337 U.S. 86, 105, 69 S.Ct. 968, 980, 93 L.Ed. 1231, 1248, 12 Alaska 348, 370–371.

49. Act of April 16, 1934, ch. 146, § 1, 48 Stat. 595, 48 U.S.C.A. § 233.

opportunity with the natives to obtain subsistence from the fish and game resources. This policy and the basic reasoning is still applicable to a substantial portion of the state. The white settlers of innumerable communities and settlements in Alaska would be immediately forced to give up residence if they were not permitted to hunt and fish with the natives as equals. Such equality has not worked to the disadvantage of the native. Wherever the white man has introduced modern equipment or methods, the native has quickly adapted them to use in his environment with as great, if not a greater, facility than the white resident of the same area. Fish traps, however, are an exception. Neither the native nor the permanent white resident of Alaska has ever owned fish traps to any extent. The original cost of construction plus payroll and maintenance effectively precluded them. Though traps have been the most effective means of commercial exploitation of the fisheries, their use did not seem to be important to the seasonal efforts of the natives or the white residents to acquire a subsistence from the fisheries until the supply began to be seriously depleted. Of course, the controversies before us extend beyond that of a right to fish for mere subsistence. The right alleged to have been disclaimed by the state and reserved to the United States is said to be extensive enough to permit the Secretary of the Interior to authorize wholesale commercial exploitation of the fisheries by the use of traps.

 We are forced to conclude that no compact as to fishing rights was formed between the State of Alaska and the United States by the second sentence of section 12 of article XII of the Alaska constitution and the responsive portion of section 4 of the Alaska Statehood Act. This is because no fishing rights were defined, as required by the condition in the offer to disclaim, and no fishing rights were "held" by or for natives at the time.

Appellants say the claimed reservation to the United States of absolute jurisdiction and control over Indian fishing in Alaska by section 4 of the Alaska Statehood Act, as amended, transcends the police power of the state under the supremacy clause of the United States Constitution, art. 6, cl. 2; that it does not violate the equal footing doctrine and is a legitimate exercise of Congress' power to regulate commerce with the Indian tribes.

The power of a state to control and regulate the taking of game within its borders was recognized by the Supreme Court of the United States in Geer v. State of Connecticut.[50] After reviewing the Civil and English common law, that court found the power to be an attribute of government, recognized and enforced by the common law of England, present in the colonial governments where not denied by charters and passed on to the states where it remains. In defining the power the court said:

"Whilst the fundamental principles upon which the common property in game rests have undergone no change, the development of free institutions has led to the recognition of the fact that the power or control lodged in the state, resulting from this common ownership, is to be exercised like all other powers of government as a trust for the benefit of the people, and not as a prerogative for the advantage of the government as distinct from the people, or for the benefit of private individuals as distinguished from the public good. Therefore, for the purpose of exercising this power, the state, as held by this court in Martin v. Waddell, [41 U.S. 367] 16 Pet. [367] 410 [10:1012], represents its people, and the ownership is that of the people in their united sovereignty. The common ownership, and its resulting responsibility in the state, are thus stated in a well considered opinion of the supreme court

50. 1896, 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793.

of California: 'The wild game within a state belongs to the people in their collective sovereign capacity. It is not the subject of private ownership, except in so far as the people may elect to make it so; and they may, if they see fit, absolutely prohibit the taking of it, or any traffic and commerce in it, if deemed necessary for its protection or preservation, or the public good.' Ex parte Maier, *ubi supra* [103 Cal. 476, 37 P. 402]."[51]

The abolition of fish traps by a state in the exercise of its police power is not new to the law. In upholding an act of the New York legislature which abolished fish pounds in 1883 the Supreme Court of the United States said through Mr. Justice Brown:

> "The duty of preserving the fisheries of a state from extinction, by prohibiting exhaustive methods of fishing, or the use of such destructive instruments as are likely to result in the extermination of the young as well as the mature fish, is as clear as its power to secure to its citizens, as far as possible, a supply of any other wholesome food.
>
> " * * * The legislature, however, undoubtedly possessed the power not only to prohibit fishing by nets in these waters, but to make it a criminal offense, and to take such measures as were reasonable and necessary to prevent such offenses in the future."[52]

A Maryland statute prohibiting purse seining for menhaden within three miles of its shores for conservation reasons was upheld as a valid exercise of its police power under the Submerged Lands Act.[53] The complete abolition of traps for the taking of salmon, with the exception of the traps

here in controversy, was upheld in Ketchikan Packing Co. v. Seaton.[54]

The absolute jurisdiction claimed to be reserved in the United States is the right to regulate and control all fishing by Indians anywhere in Alaska. There are natives in all parts of Alaska. Approximately 42 per cent of the fishing population reported in the 1950 census were natives. If the full scope of the claimed power were eventually exercised by the Secretary of the Interior, only permanent chaos and conflict could result. The magnitude of the power claimed is such that the effect could be to render useless or futile any effort by the state to regulate. In New York ex rel. Kennedy v. Becker,[55] the Supreme Court of the United States said of a situation where it was proposed that the interpretation of a treaty with the Seneca Indians be that the state would regulate fishing by the whites, on lands not on the Seneca reservation, but previously ceded by them, and the Indian tribe would regulate its members:

> "It is said that the state would regulate the whites and that the Indian tribe would regulate its members, but if neither could exercise authority with respect to the other at the *locus in quo*, either would be free to destroy the subject of the power. Such a duality of sovereignty, instead of maintaining in each the essential power of preservation, would in fact deny it to both."[56]

■ The reasoning of New York ex rel. Kennedy v. Becker is particularly applicable to the cases before us. The salmon from the sea that pass by the islands upon which appellant communities are located are bound for the many fresh water streams that empty into the inland waters, not only from

---

51. Id., 161 U.S. at page 529, 16 S.Ct. at page 604, 40 L.Ed. at page 797.

52. Lawton v. Steele, 1894, 152 U.S. 133, 139, 14 S.Ct. 499, 502, 38 L.Ed. 385, 389.

53. Corsa v. Tawes, D.C.D.Md., 149 F. Supp. 771 (3-judge court), affirmed memorandum 1957, 355 U.S. 37, 78 S.Ct. 116, 2 L.Ed.2d 70.

54. 1959, 105 U.S.App.D.C. 383, 267 F.2d 660. See also Dow v. Ickes, 1941, 74 App.D.C. 319, 123 F.2d 909, certiorari denied 1942, 315 U.S. 807, 62 S.Ct. 39, 86 L.Ed. 1206.

55. 1916, 241 U.S. 556, 36 S.Ct. 705, 60 L.Ed. 1166.

56. Id., 241 U.S. at page 563, 36 S.Ct. at page 707, 60 L.Ed. at pages 1171–1172.

the islands, but from the mainland coast of Southeastern Alaska as well. They are not the product, for the most part, of the fresh water streams near where they are caught. The schools, in many instances, still have many miles of inland sea and fresh water to traverse before they reach the stream or lake bed where they were spawned. Control of fishing, by enforcement officers advised by biologists experienced in the escapement requirements of each spawning area, is an absolute necessity if preservation and re-building of the depleted runs is to be accomplished. Each main school is generally identified by the biologists as to species, spawning destination and other characteristics. Stream escapement counts are maintained as well as a current count of the catch. The amount of commercial fishing permitted within the run of a given species destined for a given area is regulated, during the run, by trained officials governed by one central policy.[57] Dual regulation is impracticable. These migrating schools of fish, while in inland waters, are the property of the state, held in trust for the benefit of all the people of the state, and the obligation and authority to equitably and wisely regulate the harvest is that of the state.

The Secretary authorized appellants to fish with eleven traps in 1959. The number of traps he will authorize in future years and their locations will depend upon factors paramount to him. Under the power claimed the number could be without limit and in any area, as long as the right was exercised in behalf of Indians. It has not been unusual for a single trap to catch as many as 600,000 fish in a single season.[58] The impact of the catch of eleven traps on the fisheries of Southeastern Alaska is considerable from the point of view of conservation. The season's catch of a gill net or purse seine fisherman in the same area might run from 2,000 to 10,000 fish respectively. The discrimination against all fishermen, natives and whites alike, resulting from the Secretary's 1959 regulation, creates social problems for the state which it is powerless to remedy if the Secretary's claimed right is upheld. The intention to retain such a power over the basic industry of the state was not intimated in the wording of the Alaska Statehood Act, much less described. Such a power has never been reserved as to any other state admitted into the Union as far as this court is aware. The fisheries of Alaska, although pitifully depleted, are still its basic industry. The economy of the entire state is affected, in one degree or another, by the plentitude of the salmon in a given season. The preservation of this natural resource is vital to the state and of great importance to the nation as a whole. The law is so well settled that it can provoke no argument to state that as a general welfare measure a state can prohibit the use of traps for the taking of fish. Ordinance No. 3 is a welfare measure. Its objects are stated to be the relief of economic distress among fishermen, to conserve the dwindling supply of salmon and insure fair competition in commercial fishing. Alaska had every right to adopt such a policy, applicable to natives and whites alike, unless its police power with respect to natives while fishing had been rightfully curtailed.

In Ward v. Race Horse[59] the Supreme Court of the United States decided that a treaty between the United States and the Shoshonees and Bannock tribes, 15 Stat. 673, which provided that those Indians " ' * * * shall have the right to hunt upon the unoccupied lands of the United States so long as game may be found thereon * * *.' "[60] gave way to the equal footing

---

57. See Davidson & Christey, The Migration of Pink Salmon in the Clarence and Sumner Straits Regions of Southeastern Alaska (Bureau of Fisheries Bulletin No. 25, 1938) (from Bulletin of the Bureau of Fisheries 643–66).

58. Alaska Pacific Fisheries v. United States, 1918, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138, 4 Alaska Fed. 709.

59. 1895, 163 U.S. 504, 16 S.Ct. 1076, 41 L.Ed. 244.

60. Id., 163 U.S. at page 505, 16 S.Ct. at page 1076, 41 L.Ed. at page 245.

doctrine. The right given to the Indians was found to be repugnant to the rights of Wyoming, admitted into the Union after the treaty. Race Horse had killed seven elk on unoccupied land belonging to the United States, not within his reservation, but in violation of the game laws of Wyoming. This decision, in unequivocal terms, decided that if the treaty were upheld, Wyoming would be without a power possessed by all states, that of regulating the killing of game within its borders. It was argued that since the United States had the right under the Constitution to regulate commerce with the Indian tribes, it therefore had the right to exempt specific property owned by it from the game laws. The court observed that the enabling act was silent as to the reservation of any rights in favor of the Indians and that even though Congress had full authority to charge the territory with such burdens, which would continue after admission, it had not expressly done so. Race Horse had not violated any of its terms, but the treaty was required to give way to the rights of the State of Wyoming. In the act setting up a temporary territorial government for Wyoming, Congress had provided that nothing in the act was to impair "the rights of persons or property now pertaining to the Indians in said territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians".[61] The act of admission contained no exception in favor or for the benefit of the Indians. These circumstances are mentioned by appellants as distinguishing Race Horse from the cases at bar, because of the disclaimer provisions in the Alaska constitution and the wording of section 4 of the Alaska State-

hood Act. Persuasive against such a classification of Race Horse is the fact that Alaska in its constitution offered to disclaim only as to fishing rights defined in the act of admission. No Indian fishing rights were defined in the act and none were held by or for them. The treaty of the United States with the Shoshonees was the law of the land at the time of Wyoming's admission and conceivably could have been construed as binding on Wyoming although not specifically mentioned in the act of admission, had it not been found to be inferior to Wyoming's right to be admitted on an equal footing with the other states of the Union. The court specifically stated that it was influenced by the obvious intent of Congress, expressed indirectly by failing to mention any reservation.[62]

We are advised by the United States' brief, submitted as a friend of the court, that the term "(including fishing rights)" was written into section 4 over the objection of the Department of Justice and that as a result, that department then insisted that the first proviso be added in order to make doubly certain that no compensable rights in favor of Indians were being established or recognized.[63] The brief further states that in the view of the United States the "fishing rights" reserved were not true property rights, but merely fishing privileges. With that view Race Horse becomes even more persuasive and leaves no doubt as to the direct course the court would have taken in deciding the case if an undefined fishing privilege had been involved rather than a specific hunting right secured by treaty.

Appellants rely on United States v. Sandoval[64] and United States v. Kagama[65]

61. Ibid., quoting 15 Stat. 178 (1868).

62. 163 U.S. at page 515, 16 S.Ct. at page 1080, 41 L.Ed. at page 248.

63. The United States' brief refers to the original draft and that portion of section 4 which is a response to the second sentence of section 12 of article XII of the Alaska constitution. The term "(including fishing rights)" was also added to the following portion of sec-

tion 4 which is a response to the third sentence of section 12 of article XII of the Alaska constitution but this was not done until June 25, 1959. See pages 909–910, of this opinion.

64. 1913, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107.

65. 1886, 118 U.S. 375, 6 S.Ct. 1109, 30 L. Ed. 228.

as precedent for the argument that Congress' power to regulate commerce with Indian tribes extends to the Indians of Alaska.

In United States v. Sandoval, the enabling act for New Mexico required the state constitutional convention to provide by ordinance against the introduction of liquor into Indian country, which was defined as including all lands then owned or occupied by the Pueblo Indians of New Mexico. An act of Congress in 1897 had already prohibited the introduction of liquor into the area. The question was whether the enabling act requirement violated the equal footing doctrine. The court cited with approval that portion of the holding in Coyle v. Smith [66] stating that any regulation provided for in an enabling act concerning commerce or commerce with Indian tribes will derive its force, not from the compact with the proposed new state, but solely because the power of Congress extended to the subject. In holding that the twenty pueblos scattered over the state were subject to the prohibition and that neither the Act of 1897 nor the enabling act was a violation of the equal footing doctrine,[67] the following factors were specifically considered by the court as proof that Congress had the power under the constitution to regulate the Pueblos and had historically exercised it:

1. The lands comprising the pueblos were held by them in communal fee simple under grants from the King of Spain later confirmed by Congress.

2. The peoples lived in isolated communities under primitive conditions and were governed chiefly by crude customs inherited from their ancestors.

3. It was questionable whether they were United States citizens.

4. They had been historically treated as wards of the United States—were furnished with the implements of civilization, were provided with training schools and an attorney to represent their interests, and were exempt from taxation.

5. They were forbidden by New Mexico law from voting except for the election of overseers of irrigation ditches and of the officers of their pueblos.

6. The Constitution authorized Congress to regulate commerce with the Indian tribes and historically it had exercised a fostering care over all dependent Indian communities within United States borders.

7. The court approved the doctrine of United States v. Kagama.

8. Congress had a right to determine for itself when guardianship which had been maintained over the Indians should cease.

9. From 1854 onward the United States had treated the Pueblos as other Indian tribes in the United States.

The court stated, however:

"Of course, it is not meant by this that Congress may bring a community or body of people within the range of this power by arbitrarily calling them an Indian tribe, but only that in respect of distinctly Indian communities the questions whether, to what extent, and for what time they shall be recognized and dealt with as dependent tribes requiring the guardianship and protection of the United States are to be determined by Congress, and not by the courts." [68]

In comparing the facts of the past and present status of the Indians of Alaska with those considered controlling in Sandoval we find the following:

1. No land encompassing Indian fishing rights, or otherwise, is held by any Indians in Alaska in communal fee simple. The United States has never entered into any treaty or similar type agreement with any group of Indians in Alaska. There are not

66. 1911, 221 U.S. 559, 31 S.Ct. 688, 55 L. Ed. 853.

67. At 231 U.S. at page 49, 34 S.Ct. at page 7, 58 L.Ed. at page 115, the court said: " * * * [T]he legislation in question does not encroach upon the police power of the state, or disturb the principle of equality among the states."

68. 231 U.S. at page 46, 34 S.Ct. at page 6, 58 L.Ed. at page 114.

now and never have been tribes of Indians in Alaska as that term is used in federal Indian law. No permanent reservations have ever been created for Indians in Alaska.

·2. The villages of Kake and Angoon are populated largely by people of Tlingit Indian ancestry. They are not located on temporary reservations. The Tlingits occupied the greater part of what is now known as Southeastern Alaska at the time of the coming of the Russians. They spoke a single language. Organizationally they consisted of two large moieties, each moiety consisting of numerous clans. There was no tribal organization as that term is generally understood although they lived under a definite social structure.[69] They adapted quickly to the white man's way of life and long ago discarded primitive customs which served no useful purpose. The City of Kake was incorporated as a first class city under territorial law in 1952 and governs itself with an elected mayor, council and school board. The Village of Angoon was incorporated under territorial law many years ago and governs itself in much the same fashion. Both communities were provided with public schools by the territory and now are by the State of Alaska.

3. Some ancestors of the present residents of Kake and Angoon may have acquired citizenship under the Treaty of Cession with Russia in 1867;[70] all had the opportunity to acquire citizenship under the Act of February 8, 1887, which provided for the allotment of land to Indians as a means of obtaining citizenship[71] where they did not reside on reservations. An additional means of obtaining citizenship was afforded them in 1906.[72] In the second session of the Territorial Legislature in 1915 every native Indian was again given the privilege of becoming a citizen.[73] All Indians born within the territorial limits of the United States were declared to be citizens of the United States in 1924.[74] The Metlakatlans were granted citizenship by Congress in 1934.[75]

4. Neither the residents of Kake and Angoon nor their Tlingit ancestors have ever been treated as wards of the United States. The implements of civilization, such as guns, boats, outboard motors, nets, clothing, and home building materials, useful in their economy were quickly acquired by them from the white man and adapted to their use. Certain assistance has been given to appellant communities under the Act of May 1, 1936,[76] which provided that certain sections of the Wheeler-Howard Act[77] would apply to Alaska, to groups of Indians not theretofore recognized as bands or tribes, but having a common bond of occupation, or association, or residence within a well-defined neighborhood, community or rural district. These groups were permitted to organize, adopt consti-

69. Tlingit and Haida Indians of Alaska v. United States, Ct.Cl.1959, 177 F.Supp. 452, 454–455.

70. Act of June 20, 1867, art. III, 15 Stat. 539, in pertinent part provides:
"Citizenship of inhabitants; Uncivilized tribes. The inhabitants of the ceded territory * * * may return to Russia * * * but if they should prefer to remain in the ceded territory, they, with the exception of uncivilized native tribes, shall be admitted to the enjoyment of all the rights, advantages and immunities of citizens * * *. The uncivilized tribes will be subject to such laws and regulations as the United States may, from time to time, adopt in regard to aboriginal tribes of that country." See in Re Minook, D.C.D.Alaska 1905, 2 Alaska 200.

71. Ch. 119, 24 Stat. 388, as amended by ch. 868, 31 Stat. 1447 (1901), ch. 2348, 34 Stat. 182 (1906).

72. Act of May 8, 1906, ch. 2348, 34 Stat. 182.

73. S.L.A.1915, ch. 24.

74. Act of June 2, 1924, ch. 233, 43 Stat. 253 (now covered by 8 U.S.C.A. § 1401 [1952]).

75. Act of May 7, 1934, ch. 221, 48 Stat. 667 (now covered by 8 U.S.C.A. § 1401 [1952]).

76. 49 Stat. 1250, 25 U.S.C.A. § 473a (Supp.1960).

77. 48 Stat. 984 (1934), as amended, 25 U.S.C.A. §§ 461–479 (Supp.1960).

tutions and by-laws and receive charters of incorporation and federal loans under the Wheeler-Howard Act. None of the Indians of appellant communities have ever been exempt from taxation by the Territory or State of Alaska. Secretary of Agriculture Benson had the following to say in 1954 concerning the mode of life of the Indians of Southeastern Alaska:

"The mode of life for the southeast Alaskan Indian is much the same as that of the whites. The Indians live either in villages of their own or in the principal towns such as Craig, Juneau, Ketchikan, Petersburg, Sitka, and Wrangell * * * The Indian lives in the same type of residence as the white man, wears similar clothes, and eats similar food. He is a citizen and a voter. He works along side of and in competition with white citizens at the available local vocations. Both Indians and whites take wood for domestic purposes from national forest land (without permit or payment) but otherwise make little use of the forest areas. Fishing for food is done in saltwater, not in the fresh water streams. Both white men and Indians trap and hunt over the same areas. The Indians adjustment to the white man's way of life is about complete." [78]

In 1952 the following judicial comment was made on the same general subject:

"* * * [T]he Indians of Southeastern Alaska, and particularly the Haidas, have not only abandoned their primitive ways and adopted the ways of civilized life but are now fully capable of competing with the whites in every field of endeavor. * * * It is a matter of common knowledge that today the Indians of Southeastern Alaska prefer the white man's life despite all its evils and shortcomings."

"* * * Whatever may be said in justification of reservations in the unsettled regions of Alaska, they are viewed as indefensible in Southeastern Alaska, and generally condemned by whites and Indians alike as racial segregation and discrimination in their worst form." [79]

Amalgamation of the natives with the whites commenced at an early date and comparable progress has been made in other regions of Alaska as well.[80]

5. In providing for the organization of the Territory of Alaska in 1912 Congress defined the right to vote and made no exception as to natives.[81] The Indians of Alaska have not only exercised their voting privileges but have held many high elective offices. Of the sixty members of the first state legislature, nine were natives. The president of the Senate, Senator William Beltz, was an Eskimo. Senator Frank Peratrovich, of Tlingit ancestry, elected at large from the Southeastern District, which includes all of appellant communities, succeeded Senator Beltz as President of the Senate. Senator Peratrovich was a delegate to the Constitutional Convention. Senator Peratrovich's election district is

78. Brief for Appellee pp. 60–61, quoting from Report of Secretary of Agriculture Benson to Chairman, Committee on Interior and Insular Affairs, Jan. 11, 1954 (see Committee on Interior and Insular Affairs, 83d Cong., 2d Sess., Supplemental Reports of Jan. 11, 1954 on H.R. 1921, at 5–6).

79. United States v. Libby, McNeil & Libby, D.C.D.Alaska 1952, 107 F.Supp. 697, 699, 14 Alaska 37, 41, 42.

80. See In re Minook, D.C.D.Alaska 1905, 2 Alaska 200.

81. The Organic Act of August 24, 1912, ch. 387, § 5, 37 Stat. 513, 48 U.S.C.A. § 73, provided that the qualifications of electors should be the same as those provided in the Act of May 7, 1906, ch. 2083, § 3, 34 Stat. 170, which provided:
"Sec. 3. That all male citizens of the United States twenty-one years of age and over who are actual and bona fide residents of Alaska, and who have been such residents continuously during the entire year immediately preceding the election, and who have been such residents continuously for thirty days next preceding the election in the precinct in which they vote, shall be qualified to vote for the election of a Delegate from Alaska."

composed of 78.3 per cent whites.[82] In certain areas of Alaska the final outcome of an election can never be predicted until delayed returns from outlying precincts populated largely by Indians, Eskimos and Aleuts have been received.

6. As contrasted with the finding of the court in Sandoval, Congress has not historically exercised a fostering care over the communities of Kake and Angoon, nor over their Tlingit ancestors, nor in fact over any of the Indians of Alaska. They were left to make a natural adjustment with the white man and have done so with astonishing ease and thoroughness. It is believed that anything resembling a communal type organization in appellant communities is recent and exists in form to comply with the loan requirements of the Wheeler-Howard Act.[83]

7. The doctrine of United States v. Kagama has never been applicable to the Alaskan Indian under United States rule. No Indian tribe, independent nation or power has been recognized in Alaska. Crimes committed by Indians in Alaska have always been punished by the territorial and state courts.[84] There is not now and never has been an area of Alaska recognized as Indian country with one possible exception.[85] An oft quoted portion of the Kagama opinion states:

> "These Indian Tribes *are* the wards of the nation. They are communities *dependent* on the United States, dependent largely for their daily food; dependent for their political rights. They owe no allegiance to the States, and receive from them no protection. Because of the local ill feeling, the people of the States where they are found are often their deadliest enemies. From their very weakness and helplessness, so largely due to the

course of dealing of the Federal Government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power." [86]

This is almost, sentence by sentence, the exact reverse of the history of the status of the Indian in Alaska since its purchase in 1867.

8. Since Congress has never maintained any guardianship over Alaska Indians, to argue that its guardianship will terminate when Congress itself so determines, has no meaning.

9. Since Congress has never recognized any Indian tribe, nation or power in Alaska, nor treated the natives as wards in the usual meaning of that term, the historical factor relied on in Sandoval is entirely absent from this case.

The broad policy of the United States in its control of federal-Indian relations, as outlined by the United States in its brief, was first to reserve areas for the use of the Indians, to the complete exclusion of whites and of state law. This policy later provided for modified amalgamation with the white population by the allotment process and permissive application of state law to a limited degree, subject always to federal controls for the protection of the Indians. But this is not the history of federal-Indian relations in Alaska. The application of such a policy has never been necessary. Amalgamation has occurred peacefully and naturally. Adaptation to the white man's civilization has been willing and quick and in direct contrast to that made by many tribes in other parts of the United States. We do not mean to imply that the United States has not assisted in the process, for it has. In the fields of health and education, and economically in many instances, it has ren-

---

82. Rogers, Alaska in Transition 55 (1960).

83. Page 918, supra.

84. United States v. Booth, D.C.D.Alaska 1958, 161 F.Supp. 269, 17 Alaska 561.

85. See Petition of McCord, D.C.D.Alaska 1957, 151 F.Supp. 132, 17 Alaska 162.

This case stands alone in this area of Alaska law and has been distinguished in United States v. Booth, D.C.D.Alaska 1958, 161 F.Supp. 269, 17 Alaska 561, 567–568.

86. 118 U.S. at pages 383–384, 6 S.Ct. at page 1114, 30 L.Ed. at page 231.

·dered and continues to render humane and valuable assistance to the natives of Alaska. What we do say is that most of the facts which created the Indian law authority relied on by appellants are absent from this case.

When Congress passed the Alaska Statehood Act it was well aware of the right of a state to regulate the taking of ·game within its borders and we believe that it intended that all such jurisdiction then being exercised by the Secretary of the Interior under various acts of Congress be transferred to the State of Alaska as soon as it was prepared to assume this responsibility. Section 6(e) of the Alaska Statehood Act provided that all real and personal property of the United States specifically used for the sole purpose of ·conservation and protection of the fisheries .and wildlife was to be transferred to Alaska. It further provided that administration and management of the fish and wildlife under existing laws be retained by the federal government only until the Secretary of the Interior had certified to Congress that the Alaska State Legislature had made adequate provision for the administration, management and conservation of such resources in the broad national interest.[87] This section, in our view, expressed Congress' intent that all control over the management of the fish and wildlife resources of the state be given to the state, along with the property belonging to and then being used by the United States solely for such management. If there had been an intent that the Secretary of the Interior continue to exercise jurisdiction and control over all Indian fishing in Alaska it would have been expressed in this section.

It is considered significant that the temporary administration by the Secretary was to be according to the provisions of the Alaska game laws of July 1, 1943 [88] and under the Alaska commercial fisheries laws of June 26, 1906 [89] and June 6, 1924,[90] the latter being commonly known as the White Act. There is no intimation of an intent that any administration under these laws be carried out after the state had been certified as capable of its own management. The provision is that such management and control be retained by the federal government "under existing laws *until*" [emphasis added] the state legislature had made adequate provisions of its own. Such certification was made by the Secretary of the Interior on April 27, 1959 and Alaska assumed control and management of its fish and wildlife resources on January 1, 1960. At the time these controversies arose, however, the Secretary was administering Alaska's fish and wildlife resources for the interim period provided for in section 6(e).

---

87. The pertinent wording of section. 6(e) reads as follows:

"(e) All real and personal property of the United States situated in the Territory of Alaska which is specifically used for the sole purpose of conservation and protection of the fisheries and wildlife of Alaska, under the provisions of the Alaska game law of July 1, 1943 (57 Stat. 301, 48 U.S.C., secs. 192-211), as amended, and under the provisions of the Alaska commercial fisheries law of June 26, 1906 (34 Stat. 478; 48 U.S.C., secs. 230-239 and 241-242), and June 6, 1924 (43 Stat. 465; 48 U.S.C., secs. 221-228), as supplemented and amended, shall be transferred and conveyed to the State of Alaska by the appropriate Federal agency: Provided, That the administration and management of the fish and wildlife resources of Alaska shall be retained by the Federal Government under existing laws until the first day of the first calendar year following the expiration of ninety legislative days after the Secretary of the Interior certifies to the Congress that the Alaska State Legislature has made adequate provision for the administration, management, and conservation of said resources in the broad national interest * * *." 72 Stat. 340 (1958).

88. 57 Stat. 301, as amended, 48 U.S.C.A. §§ 192-211, as amended, 48 U.S.C.A. § 208 (Supp.1960).

89. 34 Stat. 478, as amended, 48 U.S.C.A. §§ 230-239, 241-242, as amended, 48 U.S. C.A. § 233 (Supp.1960).

90. 43 Stat. 464, as amended, 48 U.S.C.A. §§ 221-228 (1952).

922

Section 8(d) of the Alaska Statehood Act [91] provided that upon admission all territorial laws then in force should remain in force except as modified by the act or the state constitution or legislature; all laws of the United States were to have the same force and effect within the state as elsewhere within the United States. The term "Territorial laws" was defined to include acts of Congress, the validity of which depended solely upon the authority of Congress to provide for the government of Alaska, prior to its admission into the Union. The Alaska game laws and the White Act regulating commercial fisheries in Alaska are considered to be "Territorial laws" as defined in the act. Their validity was based on the power of Congress to govern the Territory of Alaska. Upon the admission of Alaska into the Union, these laws were to continue in full force and effect, except as modified by the Alaska Statehood Act, the Constitution of Alaska or thereafter by its legislature. The Alaska game laws and commercial fisheries acts were enacted by Congress for the broad purpose of conserving the fish and wildlife resources of the territory. The intent of sections 6(e) and 8(d) is that as soon as the state legislature had enacted adequate laws for accomplishing that same purpose, the Secretary would no longer administer the fish and game laws and any acts of Congress not already superceded, would be replaced by state law. It is our belief that upon Alaska's admission on January 3, 1959, the Alaska game laws and acts regulating commercial fisheries, as "Territorial laws", continued in force, but were modified by Ordinance No. 3 of the Alaska constitution, prohibiting the use of fish traps for the taking of salmon for commercial purposes and by article VIII, section 15, providing that "no exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State". They were further modified by the enactment by the first state legislature of a law making it unlawful to erect, moor or maintain fish traps [92] and by a later enact-

91. "(d) Upon admission of the State of Alaska into the Union as herein provided, all of the Territorial laws then in force in the Territory of Alaska shall be and continue in full force and effect throughout said State except as modified or changed by this Act, or by the constitution of the State, or as thereafter modified or changed by the legislature of the State. All of the laws of the United States shall have the same force and effect within said State as elsewhere within the United States. As used in this paragraph, the term "Territorial laws" includes (in addition to laws enacted by the Territorial Legislature of Alaska) all laws or parts thereof enacted by the Congress the validity of which is dependent solely upon the authority of the Congress to provide for the government of Alaska prior to the admission of the State of Alaska into the Union, and the term "laws of the United States" includes all laws or parts thereof enacted by the Congress that (1) apply to or within Alaska at the time of the admission of the State of Alaska into the Union, (2) are not "Territorial laws" as defined in this paragraph, and (3) are not in conflict with any other provisions of this Act." 72 Stat. 344, 345 (1958).

92. S.L.A.1959, ch. 17 (February 25, 1959) states:
"Section 1. It shall be unlawful to erect, moor, or maintain fish traps, including but not limited to floating, pile driven or hand driven fish traps, on or over any lands or tidelands owned or hereafter acquired by the State of Alaska. Nothing in this section shall prevent the maintenance, use or operation of small, hand-driven fish traps of the type ordinarily used on rivers of Alaska which are otherwise legally maintained and operated in or above the mouth of any stream or river in Alaska.
"Sec. 2. The lease or sale of any such State lands or tidelands shall contain a restrictive covenant in keeping with the intent of this Act.
"Sec. 3. A violation of this Act shall be a misdemeanor and shall be punishable by imprisonment not to exceed six months or by fine not to exceed $1,000.00 or by both such fine and imprisonment.
"Sec. 4. Ch. 154, S.L.A.1955 is hereby repealed.
"Sec. 5. This Act shall take effect immediately upon its passage and approval or upon its becoming law without such approval."

ment making it unlawful to operate fish traps and prescribing penalties therefor.[93] When the various articles of the state law providing for the administration, management and conservation of fish and wildlife became effective,[94] acts of Congress on the same subject were no longer of any force. During the period between the date of admission and the date of assumption of full control of management by Alaska the Secretary of the Interior acted as a trustee-administrator. While acting in this capacity he only partially enforced the prohibition contained in Ordinance No. 3 when he ordered the closure of all fish traps except those of appellants.[95] He disregarded the express provisions of article VIII, section 15 of the Alaska constitution by attempting to authorize a special privilege of fishery in appellants. The before mentioned constitutional provisions were basic state policy and had already been approved by Congress. They and the laws implementing them were not dependent upon the certification of the

Secretary under section 6(e) before becoming effective.

Appellants argue that the intent of the Alaska legislature expressed in Session Laws of Alaska, 1959, chapter 95, section 1, was that its acts prohibiting fish traps not be construed so as to violate the provisions of section 4 of the Alaska Statehood Act. From this premise appellants seem to conclude that the legislature enacted chapter 95 solely for the purpose of excepting appellants' traps from the general prohibitions. With this conclusion we disagree. Chapter 95 was enacted for a number of obvious reasons. Chapter 17, enacted earlier in the session, had failed to prohibit the operation of fish traps, and applied only to traps "on or over any lands or tidelands". Chapter 95 made it unlawful to *operate* a fish trap, included traps "on or over any * * * lands, tidelands, submerged lands or waters", and increased the penalties to those provided for in section 12, article III of concurrently enacted chapter 94.

93. S.L.A.1959, ch. 95 (April 17, 1959) provides:

"Section 1. It shall be unlawful to operate fish traps, including but not limited to floating, pile-driven or hand-driven fish traps, in the State of Alaska on or over any of its lands, tidelands, submerged lands, or waters; provided nothing in this section shall prevent the operation of small hand-driven fish traps of the type ordinarily used on rivers of Alaska which are otherwise legally operated in or above the mouth of any stream or river in Alaska; nor shall this Act be construed so as to violate Sec. 4 of Public Law 85–508, 72 Stat. 339, which constitutes a compact between the United States and Alaska, pursuant to which the State disclaims all right and title to any lands or other property (including fishing rights), the right or title to which may be held by any Indians, Eskimos, or Aleuts (hereinafter called Natives) or is held by the United States in trust for said Natives.

"Sec. 2. Section 1 of Chapter 17, S.L.A.1959, is hereby amended to read as follows:

"Section 1. It shall be unlawful to erect, moor, or maintain fish traps, including but not limited to floating, pile-driven or hand-driven fish traps, on or

over any lands, tidelands, submerged lands or waters owned or hereafter acquired by the State of Alaska. Nothing in this section shall prevent the maintenance, use or operation of small, hand-driven fish traps of the type ordinarily used on rivers of Alaska which are otherwise legally maintained and operated in or above the mouth of any stream or river in Alaska.

"Sec. 3. Sec. 2 of Chapter 17, S.L.A. 1959, is hereby repealed.

"Sec. 4. Sec. 3 of Chapter 17, S.L.A. 1959, is hereby amended to read as follows:

"Sec. 3. A violation of this Act shall be a misdemeanor and shall be punishable by imprisonment not to exceed one year or by fine not to exceed $5,000.00 or by both such imprisonment and fine.

"Sec. 5. A violation of this Act shall be a misdemeanor and shall be punishable by imprisonment not to exceed one year or by a fine not to exceed $5,000.00, or by both such imprisonment and fine."

94. S.L.A.1959, ch. 94, art. IV, §§ 1, 3.

95. See Ketchikan Packing Co. v. Seaton, 1959, 105 U.S.App.D.C. 383, 267 F.2d 660, which discusses the Secretary's interim authority.

The Secretary's order of March 7, 1959 abolishing all fish traps except those of appellants was in conflict with the provisions of chapter 17 enacted February 25, 1959. Prior to and during these times the Alaska legislature was working on chapter 94, providing for management of fish and game by the state. In order to enact legislation satisfactory to the Secretary and obtain his certification in sufficient time to permit the state to assume management of its fish and game on January 1, 1960, time was of the essence. As section 6(e) read at that time, ninety (90) legislative days had to elapse after the certification and during the same calendar year before the section could become effective on the first day of the succeeding calendar year.[96] After March 7th the state and the Secretary were in inconsistent written positions as to whether some fish traps were to be permitted or whether all were to be abolished. On the other hand, the Secretary's certification had to be obtained on or about May 1, 1959 in order that ninety (90) Congressional legislative days could elapse during calendar 1959. The Secretary's certification was obtained on April 27, 1959, ten days after chapters 94 and 95 were approved. Whether section 1 of chapter 95 was worded as it was in order to satisfy the Secretary is not apparent from the legislative history of the bill. It is a matter of record, however, that a representative of the Secretary was present in Juneau after March 13, 1959 for the specific purpose of assisting in drafting suitable fisheries legislation. There is nothing in the legislative history of chapter 95 to substantiate a conclusion that the state intended to recognize appellants' claimed right to operate fish traps. The entire background of the issue is contrary to such a construction. A logical explanation of the wording is that it was inserted to preserve or restore administrative harmony at a critical period with the knowledge that the issue would soon be before the courts for decision. In any event, Ordinance No. 3 of the Alaska constitution prohibited the use of all fish traps for commercial purposes in all coastal waters of the state. Appellants' traps were located in coastal waters and were commercial enterprises. These traps could not constitutionally have been excepted from the provisions of Ordinance No. 3 and there is no basis for assuming that the legislature had such an intent.

The decision of the court below dismissing all of appellants' complaints was based in part on the theory that appellants' traps were moored on tidelands or lands underlying inland waters, the sovereignty over which passed to the State of Alaska upon its admission, and that the state's right of sovereignty was paramount to any right theretofore created by Congress for Indians.

Since Martin v. Waddell [97] was decided in 1842 it has been recognized that the state, as the sovereign representative of its people, owns the right of fishery in the lands within its boundaries lying beneath navigable waters. Later the right of Massachusetts to regulate fishing in the inland waters of Buzzards Bay, an inlet of the Atlantic Ocean about thirty miles long and five to ten miles in width, was recognized by the Supreme Court in 1890.[98] Shively v. Bowlby [99] gave concise recognition to the doctrine that upon the acquisition of a territory by the United States the title and dominion in tidelands were held by it in trust for states to be ultimately created out of the territory and that new states admitted to the Union have the same rights as the original states in the tide waters and in the lands under them. The policy of the United States has been not to dispose of lands thus held in trust for new states except in un-

96. Section 6(e) was not amended to substitute "calendar" for "legislative" days until June 25, 1959, see Alaska Omnibus Act, § 2(b), 73 Stat. 141 (1959).

97. 1842, 16 Pet. 367, 41 U.S. 367, 10 L. Ed. 997.

98. Manchester v. Commonwealth, 1891, 139 U.S. 240, 11 S.Ct. 559, 35 L.Ed. 159.

99. 1894, 152 U.S. 1, 30, 14 S.Ct. 548, 38 L.Ed. 331, 342.

usual circumstances brought on by some international duty or public exigency. Such disposals are not lightly to be inferred, and should not be regarded as intended, unless the intention was definitely declared, or otherwise made very plain. In announcing the above doctrine the Supreme Court of the United States held that a swampy but navigable lake, completely surrounded by a reservation established by treaty for the Chippewa Indians, was not granted to the Indians by the treaty, but held in trust for and later granted to the State of Minnesota on its admission.[100]

The Supreme Court of the United States has consistently held that to deny to new states admitted to the Union ownership of the shores of and the soil beneath navigable waters is a denial of admission on an equal footing.[101] The appellee argues that since all of appellants' traps are located within the inland waters of Alaska and not upon lands or waters that came to Alaska by reason of the Submerged Lands Act,[102] as made applicable to Alaska by section 6(m) of the Alaska Statehood Act,[103] the provisions of the Submerged Lands Act are not applicable to this controversy. Appellee's argument appears to be consistent with the authorities and correct. In deciding United States v. State of California[104] in 1947 the United States Supreme Court did not disturb the inland waters doctrine just discussed in holding that California did not own the ocean bottom of the marginal sea. Likewise in its decrees in United States v. State of Louisiana[105] and United States v. State of Texas[106] the United States Supreme Court carefully excluded the inland waters of those states. In United States v. State of Texas,[107] Justice Douglas again reiterated the doctrine that title to lands underlying inland navigable waters passes to the new state as an

100. United States v. Holt State Bank, 1926, 270 U.S. 49, 55, 46 S.Ct. 197, 70 L.Ed. 465, 468–469.

101. Pollard v. Hagan, 1845, 3 How. 212, 228–229, 44 U.S. 212, 228–229, 11 L.Ed. 565, 573; Shively v. Bowlby, 1894, 152 U.S. 1, 26, 14 S.Ct. 548, 38 L.Ed. 331, 341; United States v. State of Texas, 1950, 339 U.S. 707, 716, 70 S.Ct. 918, 94 L.Ed. 1221, 1226.

102. 67 Stat. 29 (1953), 43 U.S.C.A. §§ 1301–1343 (Supp.1960). Sections 1311 (a) and 1313(b) provide:

"§ 1311. Rights of the States—Confirmation and establishment of title and ownership of lands and resources; management, administration, leasing, development and use

"(a) It is determined and declared to be in the public interest that (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters, and (2) the right and power to manage, administer, lease, develop, and use the said lands and natural resources all in accordance with applicable State law be, and they are, subject to the provisions hereof, recognized, confirmed, established, and vested in and assigned to the respective States or the persons who were on June 5, 1950, entitled thereto under the law of the respective States in which the land is located, and the respective grantees, lessees, or successors in interest thereof * * *

"§ 1313. Exceptions from confirmation and establishment of States' title, power and rights.

"There is excepted from the operation of section 1311 of this title— * * *

"(b) such lands beneath navigable waters held, or any interest in which is held by the United States for the benefit of any tribe, band, or group of Indians or for individual Indians * * *."

103. "(m) The Submerged Lands Act of 1953 (Public Law 31, Eighty-third Congress, first session; 67 Stat. 29) shall be applicable to the State of Alaska and the said State shall have the same rights as do existing States thereunder." 72 Stat. 343 (1958).

104. 1947, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889.

105. 1950, 340 U.S. 899, 71 S.Ct. 275, 95 L.Ed. 651.

106. 1950, 340 U.S. 900, 71 S.Ct. 276, 95 L.Ed. 652.

107. 1950, 339 U.S. 707, 716, 70 S.Ct. 918, 94 L.Ed. 1221, 1226; see United States v. States of Louisiana, Texas, Mississippi, Alabama and Florida, 363 U.S. 1, 35, 121, 80 S.Ct. 961, 4 L.Ed.2d 1025, 1049, 1096.

incident to the transfer to it of its sovereignty. However, the Submerged Lands Act was passed in 1953 and it cannot be overlooked that section 1311(a) specifically provides that in public interest "title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters" is vested in the states.[108] Section 2 of the Alaska Statehood Act provided that the State of Alaska should consist of all the territory, together with the territorial waters appurtenant thereto, then included in the Territory of Alaska.[109] Pursuant to the provisions of section 1312 of the Submerged Lands Act [110] Alaska extended its seaward boundaries to include the marginal and high seas to the extent permitted and to include submerged lands.[111]

Geographically and geologically the Alexander Archipelago of Southeastern Alaska has been determined to be a part of a long mountain range commencing with the Talkeetna Mountains in Southcentral Alaska, extending southeasterly to include the Wrangell and St. Elias Mountains. A partial inundation of the southeastern portion of the range resulted in the creation of arms of the sea and inland waterways without actually altering the original coastline facing the open sea. The trial court made Finding of Fact No. 1 based on the affidavit and attached exhibits of the Commissioner of Natural Resources of the State of Alaska.[112] This finding establishes to our

108. Note 102 supra.

109. "Sec. 2. The State of Alaska shall consist of all the territory, together with the territorial waters appurtenant thereto, now included in the Territory of Alaska." 72 Stat. 339 (1958).

110. 67 Stat. 31, 43 U.S.C.A. § 1312 (Supp. 1960) provides:
"The seaward boundary of each original coastal State is approved and confirmed as a line three geographical miles distant from its coast line or, in the case of the Great Lakes, to the international boundary. Any State admitted subsequent to the formation of the Union which has not already done so may extend its seaward boundaries to a line three geographical miles distant from its coast line, or to the international boundaries of the United States in the Great Lakes or any other body of water traversed by such boundaries. Any claim heretofore or hereafter asserted either by constitutional provision, statute, or otherwise, indicating the intent of a State so to extend its boundaries is approved and confirmed, without prejudice to its claim, if any it has, that its boundaries extend beyond that line. Nothing in this section is to be construed as questioning or in any manner prejudicing the existence of any State's seaward boundary beyond three geographical miles if it was so provided by its constitution or laws prior to or at the time such State became a member of the Union, or if it has been heretofore approved by Congress."

111. S.L.A.1959, ch. 89, §§ 1, 2 provide:
"Section 1. The jurisdiction of this State shall extend to and over, and be exercisable with respect to, waters offshore from the coasts of this State as follows:
"(1) The marginal sea to its outermost limits as said limits may from time to time be defined or recognized by the United States of America by international treaty or otherwise.
"(2) The high seas to whatever extent jurisdiction therein may be claimed by the United States of America, or to whatever extent may be recognized by the usages and customs of international law or by any agreement, international or otherwise, to which the United States of America or this State may be party.
"(3) All submerged lands, including the subsurface thereof, lying under said aforementioned waters.
"Sec. 2. The ownership of the waters and submerged lands enumerated or described in Section 1 of this act shall be in this State unless it shall be, with respect to any given parcel or area, in any other person or entity by virtue of a valid and effective instrument of conveyance or by operation of law."

112. This finding states:
"The waters of the Alexander Archipelago, State of Alaska, which lie to the landward of a line drawn from Cape Spencer lighthouse at the entrance of Cross Sound, and following generally the sinuosities of the coast, that is, the meander line of mean low water, and bridging headlands and bays as the line is drawn in a general southeasterly direction past Cape Bartholomew, Cape Muzon, and eastward through Cape

satisfaction that all of appellants' trap sites were located within the coastline and in inland waters of the state.[113]

■ We conclude that title to the lands underlying the inland navigable waters upon and over which the fish traps assigned to Kake and Angoon are located, passed to the State of Alaska as an incident to the transfer of sovereignty. No unusual circumstance brought on by international duty or public exigency existed upon which it could be inferred that the intent of Congress was otherwise. To withhold sovereignty over its inland waters from the state in the absence of compelling reasons and without definitely describing the act of admission the extent of the sovereignty intended to be withheld, would be a violation of the equal footing doctrine.[114] No plain definition of any rights intended to be withheld was given in the act of admission. In the only two instances where Congress expressed an intent in the Alaska Statehood Act that sovereignty be withheld from the state, it did so in concise, descriptive terms.[115] Under the broad power claimed to have been reserved to the United States by section 4 of the Alaska Statehood Act, the Secretary of the Interior could at any time remove or restore the state's sovereignty over any of its inland waters or marginal seas, as long as he purported to act in behalf of Indians.

Our conclusion would be no different even though we considered that the state acquired its sovereignty over inland waters by reason of the wording of section 1311(a) of the Submerged Lands Act as appellants contend.[116] Apparently this section was framed to combine in statutory form the judicially established inland waters doctrine just discussed with the grant to the states by Congress of lands beneath tidal waters seaward three geographical miles from their coastlines.[117] The sovereignty thus ac-

Chacon and ending at a line drawn from the northermost extremity of Pt. Mansfield, Sitklan Island, 040° true, to where it intersects the mainland, as more particularly described in 33 C.F.R. 82, 275, are all inland waters and historic bodies of water. Because of historic, social, and geographic considerations, of which this court takes judicial notice, and based also on a consideration of the record in this case, I find:

"That geographically and geologically the Alexander Archipelago is part of a long mountain range which extends from the southern tip of the so-called Panhandle of Alaska's general land mass in a northwesterly direction, and includes the St. Elias Mountains, the Wrangell Mountains, and the Talkeetna Mountains in Southcentral Alaska;

"That the main mass of igneous rocks which intruded the older sediments forms the core of this general land mass. The resulting topography, formed by erosion of the complex fault patterns and contacts between different rock types, and a later partial inundation, is a series of long, narrow arms of the sea, which have encroached upon the general land mass without actually altering its original coastline facing the open sea;

"That the general land mass of the Alexander Archipelago retains its mountain-range character with elevations ranging from 2,000 to 6,000 feet, and that the present arms of the sea were at one time river valleys which have been eroded by glacial action, creating the long, narrow fiords which exists today as inland waterways, the only substantial means of surface transportation throughout the Archipelago.

"That the historical economy of the area involved is primarily oriented to a marine way of life in which the inland waters furnish the primary, and in many areas, the only industry. Said waters are in every respect a necessary and intimate part and parcel of the territory of the State of Alaska."

113. United States v. States of Louisiana, etc. 1960, 363 U.S. 1, 79, 80 S.Ct. 961, 4 L.Ed.2d 1025, 1073, 1096 (offshore islands held part of Louisiana coastline).

114. Shively v. Bowlby, supra, 362 P.2d 924.

115. See § 10, providing for national defense withdrawals and reserving jurisdiction therein to the United States to the extent described and § 11, reserving exclusive jurisdiction to the United States in Mount McKinley National Park to the extent described. 72 Stat. 345–348 (1958).

116. Note 102 supra.

117. United States v. States of Louisiana, etc., 363 U.S. at page 18, 80 S.Ct. at page 972, 4 L.Ed.2d at pages 1038–1039. See particularly the legislative history of the act, id. note 16.

quired would be subject to any rights then held by or for Indians under section 1313 (b).[118] We have already expressed the view that no such rights in fishing rights were held by or for natives and that no rights were defined in the act of admission where an affirmative duty existed to define any intended reservations. Also, it is our belief that the doctrine of Shively v. Bowlby would be as applicable under the Submerged Lands Act as in the inland waters doctrine and that no such reservation could be inferred.

Although most of the foregoing opinion applies to Metlakatla as well as to Kake and Angoon, certain additional facts require a separate discussion of Metlakatla's claims.

The Metlakatlans were originally a branch of the Tsimshian Indian tribe of British Columbia. Under the guidance of a missionary and apparently with the encouragement of the United States, some 800 of these Indians emigrated from British Columbia to Annette Island in Southeastern Alaska in 1886 and established the community of Metlakatla.[119] In 1891 Congress enacted legislation which, "until otherwise provided by law", set aside the body of lands known as the Annette Islands as a reservation for the use of the Metlakatlans and such other Alaskan natives as might care to join them.[120] Annette Island was in an area historically occupied by the Tlingit

Indians, although it bordered closely on an area historically occupied by Haida Indians.[121]

In February of 1915 the Secretary of the Interior ruled that the natives of Metlakatla could erect fish traps on the shores of Annette Island. On April 7, 1916 Alaska Pacific Fisheries, a private corporation, commenced the erection of a fish trap on Annette Island in the immediate area of Metlakatla. The seaward end of this trap was within 3000 feet of the shore at mean low tide. The shoreward end was 200 feet to the seaward of the line of extreme low tide so that the trap was completely to the seaward of the upland reservation.[122] On April 28, 1916 President Wilson issued a proclamation declaring the waters within 3000 feet of the shore at mean low tide of Annette and adjacent small islands as a reservation for the Metlakatlans and such other Alaska natives as had or might join them, to be used under general fisheries regulations administered by the Secretary of Commerce. The purpose of the proclamation was stated to be that of supplementing efforts of the Secretary of the Interior to assist the Metlakatlans to self support by placing a cannery in operation on Annette Island. The contiguous waters were being reserved to supply fish for the cannery. All unauthorized persons were warned by the proclamation not to fish in the waters.[123]

118. Note 102 supra.

119. Alaska Pacific Fisheries v. United States, 1918, 248 U.S. 78, 86, 39 S.Ct. 40, 63 L.Ed. 138, 140, 4 Alaska Fed. 709.

120. "§ 358. Annette Islands reserved for Metlakahtla Indians.

"Until otherwise provided by law the body of lands known as Annette Islands, situated in Alexander Archipelago in southeastern Alaska on the north side of Dixon's entrance, is set apart as a reservation for the use of the Metlakahtla Indians, and those people known as Metlakahtlans who, on March 3, 1891, had recently emigrated from British Columbia to Alaska, and such other Alaskan natives as may join them, to be held and used by them in common, under such rules and regulations, and subject to such restrictions, as may be prescribed from time to time by the Secretary of the In-

terior." 26 Stat. 1101, 48 U.S.C.A. § 358 (1952).

121. Tlingit and Haida Indians of Alaska v. United States, Ct.Cl.1959, 177 F.Supp. 452, 455, 469 (map exhibits depicting Tlingit-Haida territory).

122. Alaska Pacific Fisheries v. United States, 9 Cir., 1917, 240 F. 274, 277, affirmed 1918, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138, 4 Alaska Fed. 709.

123. Presidential Proclamation No. 1332, 39 Stat. 1777 (1916), provides:

"Whereas the Secretary of the Interior, with a view to assisting the Metlakahtlans to self-support, has decided to place in operation a cannery on Annette Island; and

"Whereas it is therefore necessary that the fishery in the waters contiguous to the hereinafter described group comprising the Annette Islands be reserved for

On May 2, 1916 the Assistant United States Attorney for Alaska advised Alaska Pacific Fisheries of the proclamation, but that corporation denied the President's authority to issue it. A suit for injunction was filed and granted by the District Court of Alaska. The Ninth Circuit Court of Appeals sustained the authority of the President on usage and the practical necessities of government. The corporation was found to have no permit from the War Department to erect an obstruction to navigation and as to the United States who owned the land, it was held to be a mere trespasser.[124] The Supreme Court of the United States affirmed. It noted the temporary nature of the reservation and the importance of the adjacent fishing grounds. It ignored the Presidential proclamation and held that the geographical name "Annette Islands" was intended by Congress to embrace the "intervening and surrounding waters" as well as the upland.[125] An act of Congress in 1934 which granted citizenship to the Metlakatlans, declared that any reservations theretofore made by Congress or by executive order or proclamation for their benefit should continue in full force, but should continue to be subject to modification, alteration, or repeal by Congress or the President. The act also declared that the granting of citizenship was not to affect their individual or collective rights to property nor the right of the United States to supervise the affairs of the colony.[126]

The land reservation was a temporary withdrawal which has been described by the United States Supreme Court as "not in the nature of a private grant, but simply a setting apart 'until otherwise provided by law,' * * *."[127] The extension of the reservation by Presidential proclamation to

the purpose of supplying fish and other aquatic products for said cannery.

"Now, therefore, I, Woodrow Wilson, President of the United States of America, by virtue of the power in me vested by the laws of the United States, do hereby make known and proclaim that the waters within three thousand feet from the shore lines at mean low tide of Annette Island, Ham Island, Walker Island, Lewis Island, Spire Island, Hemlock Island, and adjacent rocks and islets, located within the area segregated by the broken line upon the diagram hereto attached and made a part of this proclamation; also the bays of said islands, rocks, and islets, are hereby reserved for the benefit of the Metlakahtlans and such other Alaskan natives as have joined them or may join them in residence on these islands, to be used by them under the general fisheries laws and regulations of the United States as administered by the Secretary of Commerce.

"Warning is hereby expressly given to all unauthorized persons not to fish in or use any of the waters herein described or mentioned."

124. Alaska Pacific Fisheries v. United States, 240 F.2d at page 283, supra note 122.

125. Alaska Pacific Fisheries v. United States, 1918, 248 U.S. 78, 39 S.Ct. 40, 42, 63 L.Ed. 138, 4 Alaska Fed. 709.

126. Act of May 7, 1934, ch. 221, §§ 1, 2, 48 Stat. 667 (now covered by 8 U.S.C.A. § 1401 [1952]) provided:

"* * * [T]he Indians of the Tsimshian Tribe, and those people known as Metlakahtlans, who emigrated from Metlakahtla, British Columbia, Canada, to Annette Island, in the Alexander Archipelago in southeastern Alaska in the year 1887, and there established a colony known as Metlakahtla, Alaska, and any and all other British Columbia Indians who joined them there not later than January 1, 1900, and have since resided continuously therein, having been faithful and loyal to the Constitution, laws and the Government of the United States, are hereby declared to be citizens of the United States."

"Sec. 2. The granting of citizenship to the said Indians shall not in any manner affect the rights, individual or collective, of the said Indians to any property, nor shall it affect the rights of the United States Government to supervise and administer the affairs of the said Metlakahtla Colony. And any reservations heretofore made by any Act of Congress or Executive order or proclamation for the benefit of the said Indians shall continue in full force and effect and shall continue to be subject to modification, alteration, or repeal by the Congress or the President, respectively."

127. Alaska Pacific Fisheries v. United States, 1918, 248 U.S. 78, 88, 39 S.Ct. 40, 41, 63 L.Ed. 138, 140, 4 Alaska Fed. 709, 712.

include waters within three thousand feet of the shoreline was at least as temporary as the land withdrawal and possibly more so.[128] In granting citizenship to the Metlakatlans in 1934, Congress confirmed the reservations as they then existed, but specifically provided that they should continue to be subject to modification, alteration, or repeal by Congress or the President.[129]

It appears likely that the land reservation was created to reward the initiative of the Metlakatlans and give them some legal rights to be in an area to which they as non-citizens and non-residents had no historical rights. The decision of the Secretary of the Interior in 1915 to establish a cannery on the island to assist the Metlakatlans is in keeping with the original government policy of encouragement. When the supply of fish immediately available to them to supply their cannery appeared to be jeopardized by the act of Alaska Pacific Fisheries, it then appeared necessary to extend the upland reservation to a distance offshore sufficient to prevent any trap fishing other than by Metlakatlans. Alaska Pacific had located its trap so that the shoreward end was still two hundred feet to the seaward of extreme low tide, therefore no trespass on the upland reservation was being committed. On the other hand, the Metlakatlans as a group had not yet been admitted to United States citizenship. Alaska Pacific Fisheries, as a corporation of a state of the United States, no doubt had superior rights in the fisheries of the inland waters.[130] Extension of the boundaries of the reservation, as was done, may well have been the only alternative presented to the government in order to continue and implement its policy of encouragement toward an alien immigrant group. The effect of the extension, whatever reasons may have motivated it, was to create the only exclusive right of fishery ever to exist in Alaskan waters.

The Metlakatlans have prospered, amalgamated easily with the native and white population and are in all respects citizen assets to the United States and the State of Alaska. Annette Island accommodates one of the larger airports of Alaska which serves as the air port of entry to nearby Ketchikan, which is not accessible by highway, for all except amphibious flights. The citizens on Annette Island operate the gasoline concessions and service the large planes of the certificated carriers that regularly stop there. They sell power from a hydro-electric plant, and operate a sawmill, boat-building facilities and mercantile and other business establishments. Many are trained mechanics, electricians, carpenters and shipwrights. They individually own numerous and valuable seine boats, which they use for halibut as well as salmon fishing.[131] Schools were furnished by the Territory of Alaska and are now furnished by the state. The residents pay all forms of taxes just as do other Alaska citizens. Prosecution for the commission of crimes is handled in all respects as though there was no reservation.[132] The State of Alaska appropriated monies for work projects for depressed areas for fiscal 1960–61. Funds were allocated for Metlakatla as well as for other communities temporarily depressed because of poor fishing seasons.

■ What we have said previously concerning the omission of Congress to define native fishing rights in the Alaska Statehood Act is equally applicable here. The water reservation held by the Metlakatlans was the only fishing privilege held by a native community at the time of enactment of the Alaska Statehood Act. It did not, in our opinion qualify as a fishing right as that term was used in section 4 of the act, because of its truly temporary nature. If it had been the intent of Congress that the privilege continue after Statehood we be-

128. Sioux Tribe of Indians v. United States, 1942, 316 U.S. 317, 62 S.Ct. 1095, 86 L.Ed. 1501.

129. Act of May 7, 1934, ch. 221 §§ 1, 2, 48 Stat. 667 (now covered by 8 U.S.C.A. § 1401 [1952]).

130. Act of June 14, 1906, ch. 3299, § 1, 34 Stat. 263, 48 U.S.C.A. § 243.

131. See United States v. Booth, D.C.D. Alaska 1958, 161 F.Supp. 269, 17 Alaska 561, transcript of testimony.

132. United States v. Booth, D.C.D.Alaska 1958, 161 F.Supp. 269, 17 Alaska 561.

lieve Congress would have so stated because of the affirmative duty imposed by the Alaska constitution to define any such reservations in the act of admission. The issue now is not whether the Metlakatlans have a right of possession to the waters surrounding their upland reservation superior to that of a corporate trespasser, but whether sovereignty over its inland waters has by inference been withheld from a state of the Union. The presumption is that it was not. Such a withholding is not lightly to be inferred.[133] The continued maintenance of such a right is in direct collision with state constitutional provisions prohibiting fish traps and exclusive rights of fishery. Metlakatla's temporary privilege had nowhere near the stature of the hunting right of Race Horse[134] which was secured by a treaty.

It is our belief that Metlakatla's exclusive fishing reservation resulted from a combination of unusual circumstances and acts disconnected ·in time, designed to assist them in the early days of their settlement. The water reservation would doubtless never have been created if it had not appeared necessary to protect their right to fish with traps to supply their cannery, at a time when trap fishing was legal and widely employed. The existence of the exclusive water reservation is now used as a reason to justify the continued use of traps, even though such use is illegal everywhere else in the state. None of the facts which seemed to justify the creation of the exclusive right of fishery are now operative. The Metlakatlans are now citizens of the United States and of the State of Alaska and have the same right to fish anywhere in the inland waters and marginal sea as other United States citizens. They are as prosperous as the average fishing community of Alaska, if not more so. They are no more entitled to or in need of fishing advantages over their fellow citizens than any other fishing community of Alaska and we do not believe that Congress intended that their temporary privilege in the waters surrounding their upland reservation continue after Statehood. Congress has exercised a fostering attitude toward the Metlakatlans far beyond that extended to the natives of Alaska. They were encouraged to immigrate, were given a land reservation, and although they were non-citizens, the Secretary of the Interior gave them permission to fish with traps. The President then gave them an exclusive inland water fishery reservation to supply the cannery subsidized by the government. This concern for their welfare was continued after they had attained United States citizenship and to the present. Whether Congress had the power to so subsidize an alien immigrant group, even though they were Indians, seems doubtful. The power of the President to create an exclusive fishery reservation for such a group seems even more doubtful. However, these are questions that need not be decided by this court at this time. For the reasons already stated we are of the opinion that Metlakatla's water reservation did not survive Statehood.

Appellants have pointed out that sizeable balances remain unpaid on government loans which financed the purchase of traps, canneries, boats and related gear. They also argue that the loss of trap fishing privileges will seriously affect their economy. It appears from the record that there is a sufficient number of independent seine boats in Southeastern Alaska to supply appellants' canneries. If not, the vacuum will undoubtedly be filled within a very short time. We are not convinced that the over-all economy of appellant communities will suffer. On the contrary, there is every reason to believe that the economy of the individual fisherman will be improved. Financial adjustments on loan repayments may be necessary. Adjustment has already taken place in the salmon industry generally. Private enterprise has been required to made radical financial and physical adjustments patterned as nearly as possible to the state's flexible

---

133. United States v. Holt State Bank, 1926, 270 U.S. 49, 55, 46 S.Ct. 197, 70 L.Ed. 465, 469; Shively v. Bowlby, 1894, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331.

134. At page 915, supra.

plan for the conservation and rebuilding of the salmon resource.

In adopting Ordinance No. 3 abolishing fish traps the people of Alaska were not unaware that some economic adjustments would be required. The pros and cons of the issue had been considered for many years. All persons engaged in the salmon industry had notice of the obvious trend. The referendum of 1948, the overwhelming adoption of Ordinance No. 3 in 1956 and passage of the Alaska Statehood Act in 1958 clearly indicated the early arrival of the day when the will of the people could be effected. Temporary inconveniences must be subordinated to a policy dedicated to preventing exploitation to annihilation of one of the greatest natural food resources known to mankind, to equitable regulation of seasonal harvests for the greatest benefit to the greatest number, while conserving and rebuilding for posterity. The judgments below are affirmed.